STATE EX REL. HASKINS and others, by Guardian *ad litem*, on behalf of themselves and all persons similarly situated, Petitioners, v. COUNTY COURTS OF DODGE AND MILWAUKEE COUNTIES, MILWAUKEE COUNTY CIRCUIT COURT and others, Respondents.

*No. State 38. Argued October 3, 1973.—Decided February 18, 1974.*

(Also reported in 214 N. W. 2d 575.)

For the petitioners there were briefs and oral argument by *Howard B. Eisenberg,* state public defender.

For respondent Robert W. Warren, attorney general, the cause was argued by *William A. Platz,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general, in pro. per.

For respondent County Court of Dodge County, there was a brief and oral argument by *James H. Olson,* Dodge county district attorney.

A brief amicus curiae was filed by *E. Michael McCann,* Milwaukee county district attorney, and *Richard P. Klinkowitz,* assistant district attorney of Milwaukee county.

HEFFERNAN, J.   This original action for declaratory judgment is brought by the state public defender on behalf of named persons and others similarly situated who have been found incompetent to stand trial and who have been committed to a mental institution until such time that criminal proceedings against them may be resumed or until there be some disposition of the individuals by treatment under a civil commitment or by discharge.  Each of the named petitioners was committed to a state mental institution until such time as he was able to understand the proceedings against him or to assist in his own defense.  The period of confinement ranges from fifteen months to eleven years.

It is contended by the state public defender and acknowledged by the attorney general that the petitioners have not regained their competency, nor is it likely that they soon will.

It is contended that under a recent holding of this court, *State ex rel. Matalik v. Schubert* (1973), 57 Wis. 2d 315, 204 N. W. 2d 13, and a decision of the United States Supreme Court, *Jackson v. Indiana* (1972), 406 U. S. 715, 92 Sup. Ct. 1845, 32 L. Ed. 2d 435, the period for which the defendants may be held in the course of the criminal process because they are incompetent to stand trial is limited, and when it appears that competency to stand trial is not likely soon to be regained, the state has an obligation either to dismiss the cases against such persons and to discharge them or to further

commit them for treatment under the appropriate civil procedures.

*Jackson v. Indiana, supra,* basically prohibits the commitment of a person as incompetent to stand trial longer than is necessary to determine whether that person can become competent to meaningfully take part in the criminal procedures against him.

*Matalik, supra,* was this court's response to the mandate of *Jackson.* While *Matalik* was concerned in part with the important question of the requirements of due process that must be afforded to all criminally accused persons who are alleged to be incompetent to stand trial, it went further and prescribed procedures for future disposition of such cases when it appeared that the accused person would not soon or would never recover competency. We said:

"We consider that a period of six months after commitment has commenced should be long enough to determine whether such a person as petitioner will never recover or will not soon recover his competency so as to be able to stand trial, and if the respondent desires that petitioner be permanently committed, he either commence civil commitment proceedings under ch. 51, Stats., within sixty days from the date of this order, or otherwise release petitioner." (P. 328)

Counsel agree that one of the problems posed by the mandates of *Jackson* and *Matalik* is what disposition should be made by the committing court when, after the six-month period mandated in *Matalik* has passed, the court is informed by the department of health & social services that, alternatively, a defendant is competent to stand trial, is not now competent to stand trial but will probably become competent within the ensuing six-month period, or is not likely to become competent in the foreseeable future.

The attorney general agrees with the basic position of the state public defender that, at such time and after

a proper hearing it is determined that the defendant is not competent to stand trial and will not be competent within the foreseeable future, he should no longer be held under the criminal statutes relating to incompetency for trial, but should be diverted to a noncriminal type of custody.

The state public defender takes the position that, if at the end of the first six-month period the court determines that the defendant is not then competent but will probably become competent within the ensuing six-month period, he may continue to be held as a defendant awaiting trial for a total period not to exceed twelve months. It is the state public defender's position that, at the end of the twelve-month period if the defendant has not regained competency, the underlying criminal action should be dismissed with prejudice, and that under some circumstances a civil commitment may follow.

The attorney general takes the position that, if at the end of the twelve-month period the defendant has not regained his competency but will probably become competent within an additional six-month period, he may be held for an additional six-month period or for a total of eighteen months. If at the end of that time he is not restored to trial competency, the attorney general agrees that a noncriminal form of custody must be substituted. He argues, however, in no case should the criminal charges be dropped unless, in the discretion of the district attorney, a motion of *nolle prosequi* is entered and accepted by the court.

When it is determined by the committing court that the defendant is unlikely to regain competency and the facts warrant a civil commitment, an additional procedural problem is presented: By whom should the application for the civil commitment be made and by what court should jurisdiction for the civil commitment be assumed—a court in the county in which the de-

fendant has been incarcerated or in the county from which he was committed.

An additional problem remains, and that is: When, if ever, should the criminal proceedings be terminated with prejudice.

The state public defender takes the position that at such time as the defendant is found "hopelessly incompetent," the underlying criminal action must be dismissed with prejudice. The state public defender urges that this dismissal of a criminal action occur when the committing court makes that finding, irrespective of whether that finding is made after six months, twelve months, or eighteen months.

The attorney general argues that a dismissal with prejudice should not be of course on the finding of probable indefinite incompetency but only at such time when it appears that an individual defendant could not even, were he to recover competence, have a fair trial because of his deprivation of a speedy trial.

It is apparent that the problems implicit in this case raise a panoply of policy considerations that cannot be completely dealt with by a court. Eventually they must be resolved by considered legislative judgment. We are, to the extent that we are able, obliged to cope with the problems that were not envisaged by the legislature and which were forced upon the state as the result of the mandate of the United States Supreme Court.

We are primarily concerned with two portions of the statutes, those that appear in secs. 971.13 and 971.14, Stats., relating to incompetency to stand trial, and the provisions relating to civil commitments in ch. 51.

Sec. 971.13, Stats., provides:

"**Competency to proceed.** No person who as a result of mental disease or defect is unable to understand the proceedings against him or to assist in his own defense, shall be tried, convicted, sentenced or committed for the commission of an offense so long as such incapacity endures."

Sec. 971.14, Stats., sets forth the steps to be followed in the examination of a defendant with respect to competency to proceed. It is in many respects a highly enlightened statute. It provides that commitment cannot be made pending trial unless there is a hearing that establishes that the defendant has probably committed the crime charged or he has been bound over for trial after a preliminary examination which incorporates a finding of probable cause. In the event probable cause is established, the court is required to appoint at least one physician to examine and report upon the defendant's condition. In lieu of such appointment, the court may order the defendant committed to a suitable mental facility for the purpose of examination for a period of not more than sixty days. The report thereafter made must include a description of the examination, the diagnosis of the mental condition of the defendant, and, if the defendant suffers from a mental disease or defect, an opinion of the defendant's mental capacity to understand the proceedings against him and his capacity to assist in his own defense.

In the class of defendants before us, the appropriate court has followed the procedure by which the defendants were found incompetent to proceed.

Sec. 971.14 (5), Stats., provides in part:

"If the court determines that the defendant lacks competency to proceed, the proceeding against him shall be suspended and the court shall commit him to the custody of the department [Health and Social Services] to be placed in an appropriate institution of the department for so long as such condition endures."

Sec. 971.14 (5), Stats., also provides that:

"When the maximum period for which the defendant could have been imprisoned if convicted of the offense charged has elapsed, the court shall dismiss the case and shall order the defendant to be discharged subject to the right of the department to proceed against the defendant under ch. 51."

Sec. 971.14 (6), Stats., provides:

"The fact the defendant is not competent to proceed does not preclude any legal objection to the prosecution pursuant to s. 971.31 which is susceptible of a fair determination prior to trial and without the personal participation of the defendant."

Sec. 971.31, Stats., deals with motions which are capable of determination without the trial of the general issue, including objections to the defects in the institution of the proceedings, insufficiency of the complaint, information, or indictment, invalidity of the statute under which charged, suppression of evidence, etc.

Unlike the statutes of many states, the Wisconsin statute affords important protections to the defendant, in that he can be committed as incompetent to stand trial only upon a finding of probable guilt, he cannot be indefinitely consigned to the limbo of incompetency since he cannot be held beyond the maximum for which he could have been committed, and important pretrial aspects of the prosecution can be disposed of even in his absence. The right to have such motions heard may preserve important matters of defense and in some cases may result in a dismissal at that point.[1]

Despite the enlightened nature of the Wisconsin statute, the basic justification of a statute which prohibits the state from proceeding against an incompetent person is to protect him from a criminal prosecution when he is unable to defend himself and to make sure that he will be afforded a due process trial at a time when he can assist in his own defense.

Eventually the time is reached when it becomes apparent that commitment can serve no purpose other

[1] Secs. 971.14 (6) and 971.31, Stats., impose a positive duty on defense counsel to interpose these defenses to the extent possible without the participation of the defendant.

than the custodial warehousing of an individual who cannot appropriately be dealt with by the criminal law. If incarceration continues at a time beyond which it can be justified as being for the purpose of protecting the rights of the defendant, the incarceration is, in effect, penal in nature and cannot be justified. That rationale was well explained in *Jackson v. Indiana, supra. Jackson* held:

"[T]hat a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant." (P. 738)

The United States Supreme Court in *Jackson* refused to prescribe arbitrary time limits within which a state must reach a determination. It noted, however, that Jackson had been confined for three and one-half years under circumstances that established the lack of substantial probability that he would ever be able to participate fully in a trial. In *Jackson,* the court also said that, even though there were an adjudication that a defendant committed for incompetency would probably or eventually regain his ability to assist at his own trial, continued incarceration under the criminal law could only continue if "justified by progress toward that goal." (P. 738)

In *Matalik, supra,* we held that a re-examination was mandated after six months from the time of the original confinement. We considered that period sufficient to determine whether the defendant would never recover or not soon recover his competency so as to be able to stand trial. If that were the determination, we con-

cluded the defendant should be released; however, the department was permitted to retain custody of the defendant for up to sixty days to commence civil commit- ment proceedings under ch. 51, Stats., if the department desired permanent commitment of the defendant.

It is implicit in *Matalik* and explicit in *Jackson* that continued incarceration cannot be continued unless there is evidence in the record that the criminal incarceration will not continue indefinitely but will soon be terminated.

In the instant case, the state public defender agrees with the contention of the attorney general that the six-month limitation of *Matalik* should not be inflexible. The state public defender takes the position that, at a second re-examination, twelve months after the original commitment, if the defendant has not then recovered his competency, he must be released from the commit- ment under sec. 971.14, Stats. He bases his argument on the ground that statistics available from the depart- ment of health & social services show that few de- fendants regain their competency after the passage of a twelve-month period. The attorney general's answer to the petition for original jurisdiction supports the state public defender's position that a majority of de- fendants who are incarcerated under sec. 971.14 regain their competency, if ever they do, during the first six months of their commitment. Those statistics, however, also demonstrate that a substantial number regain competency during the second six-month period, and that a considerably smaller, but appreciable number, of de- fendants regain competency between the twelfth and eighteenth month of their commitment. These statistics are sparse and do not reflect absolutes. They do, how- ever, reflect the position of both the state public de- fender and the attorney general, and which seems to be well accepted by the literature on the subject, that there rapidly comes the time when the likelihood of

regaining competency substantially diminishes. M. Leavy, *The Mentally Ill Criminal Defendant,* 9 Criminal L. Bulletin (1973), 197, 231, 232; G. H. Morris, *The Confusion of Confinement Syndrome: An Analysis of the Confinement of Mentally Ill Criminals and Ex-Criminals by the Department of Correction of the State of New York,* 17 Buffalo L. Rev. (1968), 651, 656.

The legislature has, as a matter of policy, placed the outside limit of a period of confinement to not exceed the term for which the defendant could have been imprisoned if convicted of the offense charged. Sec. 971.14 (5), Stats.

In light of *Jackson,* it is apparent that this legislative determination of the cut-off period for a sec. 971.14, Stats., commitment can no longer be justified, since the term of conviction is irrelevant to the question of whether the competency of an individual defendant to stand trial will soon be regained. We are, however, guided by legislative policy. In respect to the petitioners in this case, all of them would be subject to prison terms substantially in excess of the time now served under the commitment for incompetency. We are obligated to give due heed to legislative policy that the maximum period of confinement under sec. 971.14 should comport as nearly as possible with the maximum term of confinement and yet we are required to stay within reasonable constitutional limits.

On the basis of the limited evidence before us in respect to the usual time within which competency is regained while a defendant is committed at a state institution, we cannot conclude that either the twelve-month period or the eighteen-month period is the more appropriate. Were we to look at the question *ab initio,* it would appear that treatment beyond the twelve-month period yields a drastically reduced percentage of cures.

We conclude, however, under the evidence before us and in light of the legislative policy, that the ultimate retention of a defendant under sec. 971.14, Stats., should be limited to eighteen months—a period that more nearly comports with the legislative policy than does the shorter twelve-month period. From *Jackson* it is clear, however, that, if at any earlier time it appears that a defendant has not regained his competency and is not making progress toward that goal, he must be discharged from the criminal commitment.

An additional question arises when it is found that a defendant is not likely to soon recover his competency to stand trial and must be discharged from his sec. 971.14, Stats., commitment. Sec. 971.14 (5) indicates that the defendant may then be proceeded against under the provisions of ch. 51. Ch. 51 is the State Mental Health Act. It permits a court to commit a person under prescribed procedures to a mental health institution.

Since our mandate in *Matalik,* there has been a substantial question whether the venue for a commitment under ch. 51, Stats., is in the county from which the defendant was originally committed or in the county which has been the site of his custody. We conclude that the venue is statutorily mandated to be in the county from which the defendant was committed. Under sec. 971.14, the committing court has, for trial competency purposes, continuing jurisdiction over the defendant until the prosecution is resolved, either by trial and judgment or dismissal by the trial court. The trial court also has jurisdiction to find that the defendant is not likely soon to regain his competency under the standards of *Jackson* and *Matalik.* Under the statutory scheme, therefore, the defendant would be "found" in the county of the committing court when he is brought before the court and that court determines that he is permanently unable to proceed to trial.

Sec. 51.01 (1) (a), Stats., provides:

"51.01 **Procedure to determine mental condition. (1)**
APPLICATION TO COURT. (a) Written application for the
mental examination of any person (herein called 'pa-
tient') believed to be mentally ill, mentally infirm or
mentally deficient, and for his commitment, may be made
to the county court of the county in which the patient
is found, by at least 3 adult residents of the state, one
of whom must be a person with whom the patient resides
or at whose home he may be or a parent, child, spouse,
brother, sister or friend of the patient, or the sheriff
or a police officer or public welfare or health officer.
However, if the patient is under 18 years of age, the
application shall be made to the juvenile court of the
county in which such minor is found."

That statute also resolves another problem arguably
posed by *Matalik*. Therein we stated that civil commit-
ment proceedings under ch. 51, Stats., should be initiated
by an appropriate officer of the department of health
& social services. That statement is undoubtedly correct
in the context of *Matalik*, and under the statute cited
the application may be made by a public welfare or
health officer.

The application made by the department under sec.
971.14 (5), Stats., contemplated that the department
might proceed against a defendant at such time as he
had been held for the maximum period for which he
could be held were he convicted. Under the facts of
this case, and the situations envisaged by *Jackson* and
*Matalik*, it is not unlikely that the time at which the
criminal incarceration must terminate would substan-
tially antedate the period of maximum criminal confine-
ment.

It appears appropriate and consistent with the
statute above cited for the persons enumerated in sec.
51.01 (1) (a), Stats., to make application for a civil
mental examination and for commitment. Consistent,

however, with the provisions of sec. 971.14 (5), the department, by virtue of having the defendant under observation, is peculiarly in a position to have the knowledge necessary to initiate the ch. 51 procedure if it so desires, and the mental hearing and commitment may proceed on the application of the department alone.

A question is also raised about the nature of the hearing to be afforded when a defendant is returned to the committing court, as he must be under *Matalik,* when six months have elapsed after the original commitment. We conclude that a full due process hearing, as required by *Matalik,* in the first re-examination is necessary in a subsequent hearing unless there is a waiver of such hearing by the defendant and by the district attorney.

In effect, then, the question of competency may be decided without a formal hearing unless the report of the department of health & social services is challenged either by the state or by the defendant. An affirmative waiver must, however, be shown; and even where the hearing is waived, it is the responsibility of the court to make the appropriate findings on the basis of the information before it. As sec. 971.14 (4), Stats., points out: "The defendant's competency to proceed shall be . . . determined by the court."

The determination of competency to stand trial is a judicial matter, and a finding is not to be made on the basis of rubber stamping the report of a psychiatrist.

A review of the literature which abounds in this field indicates that too often medical experts either are ignorant of the limited scope of the competency-to-stand-trial hearing or, through overconservatism, play it safe and conclude that the defendant is not competent to stand trial because of a diagnosis of mental illness which may not be related to the limited nature of the competency question at this stage of the proceedings.

Competency to stand trial has been definitively stated in the case of *Dusky v. United States* (1960), 362 U. S. 402, 80 Sup. Ct. 788, 4 L. Ed. 2d 824:

"[T]he 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' "

Elaborate diagnoses or elaborate psychiatric evaluations directed to the ultimate treatment of the subject are of little use to a court in determining this question.

"What prosecution, defense counsel, and court need to know are the facts relevant to the decisions they must make: In what ways the accused's mental condition would affect his ability to understand the particular legal proceedings in prospect and to cooperate with his counsel; whether he requires immediate treatment, and if so, what kind; what problems of communication his counsel should be aware of; what possibility there is of changes in his condition under stress of trial or during pretrial detention; how likely he is to regain competency or to recover from his illness if hospitalized, and whether quickly or only over a long period of treatment; whether he might with the aid of drugs or short-term therapy be made more able to understand the proceedings and cooperate with counsel; whether, if treatment is indicated, he requires a maximum security institution or could safely be treated in a regular state hospital or as an outpatient." M. Leavy, *The Mentally Ill Criminal Defendant*, 9 Criminal L. Bulletin (1973), 197, 217, 218.

Any experienced criminal lawyer, whether representing the state or a defendant, has frequently faced situations where the medical report indicated "incompetency to stand trial," when what really was meant was merely that the defendant had some mental illness which required treatment. This problem arises from lack of communication between the medical and legal professions and the failure of the trial judge, the prosecutor, and the

defense attorney to make clear the limited nature of the medical inquiry.

There is a substantial body of thought that the use of psychiatric testimony for this limited purpose is inappropriate and that a psychiatrist has no special knowledge that enables him to advise lawyers and judges on what is essentially a legal question.

Our statute, however, clearly recognizes the legislature's belief that psychiatric testimony is highly relevant. On the other hand, Dr. Karl Menninger and other highly reputable and authoritative authors have written that the persons best able to make the determination of competency to stand trial are the judge and lawyers involved in the case; and that psychiatrists, helpful though they may be in recommending a final disposition of a case, should be completely excluded from the process at this stage.[2]

Under the situation contemplated by the legislature when sec. 971.14, Stats., was drafted, the committing judge was required to dismiss the charges when the defendant had been committed for the maximum period possible under a criminal incarceration. That continues to be mandatory, and a dismissal must then be entered on the merits pursuant to the legislature's determination.

In this case we have, however, been asked to determine the obligation of the committing judge with respect to the dismissal or continuation of the charge at such earlier time as the defendant may be released from his incompetency-to-stand-trial commitment. In the case before us, there is no allegation that any of the defendants have been confined for their maximum term of incarceration under the criminal charge, and the mandatory dismissal provided by sec. 971.14 (5), Stats., is not applicable.

---

[2] As an appendix hereto there appears an excerpt from Karl Menninger, M.D., *The Crime of Punishment,* pp. 141, 142.

It is argued by the state public defender that the criminal charge must be dismissed on the merits before a civil court can assume jurisdiction to make a commitment under ch. 51, Stats. The principal legal reliance in support of this position is that the legislature prescribed that procedure when the defendant had been confined for the maximum penal term. While the statute is reasonable in its handling of the situation it contemplated, we consider it wholly irrelevant in the instant case. We have been presented only with social policy reasons and not legal reasons in support of the argument that a civil court cannot have jurisdiction over the person of a defendant while criminal charges are pending.

The state public defender has made persuasive arguments directed to the therapeutic and rehabilitative aspects of both the criminal and the civil law to demonstrate that neither of these purposes is best served by continuing a criminal charge when a person is committed civilly under ch. 51, Stats. That argument may well go to the desirability of dismissing the charges, but demonstrates no basis for the power in a trial court to effect the dismissal on these grounds alone.

The petitioners herein have not convinced us that the power to dismiss at this juncture is conferred upon the trial judge by the common law. Rather, we are convinced that, in the absence of a statute to the contrary, a court has no power before trial to dismiss criminal charges or enter a *nolle prosequi*. *People v. Guido* (1973), 11 Ill. App. 3d 1067, 1069, 297 N. E. 2d 18. Also holding that a court has no power at common law to dismiss a charge on its own motion are *People v. Dennis* (1967), 164 Colo. 163, 165, 433 Pac. 2d 339, and *State v. Raburn* (1966), 76 N. Mex. 681, 683, 684, 417 Pac. 2d 813.

It may well be that such authority should be legislatively conferred upon a trial judge, to be exercised

after a full hearing at which both the state and defendant are represented. It would appear to be a rather pointless and a cruel application of the law, as well as an additional burden on prosecutors and courts, to keep pending criminal charges that will never be brought to trial. It was undoubtedly this aspect of the problem with which the legislature was concerned in enacting sec. 971.14 (5), Stats. Since *Jackson,* however, the same situation may well arise at an earlier date. We believe that this is a legislative problem and that the desirability of authorizing the dismissal of charges when a commitment is terminated under *Jackson* might well be the subject of the legislature's consideration.

We conclude, desirable as a dismissal on the merits may be in some cases when the commitment for incompetency to stand trial must terminate, that there is no authority for a trial judge to sua sponte order a dismissal.

Additionally, the release from a period of commitment because of inability to stand trial raises the problem of committability under ch. 51, Stats., if that alternative to release is considered. *Lessard v. Schmidt* (E. D. C. Wis. 1972), 349 Fed. Supp. 1078, if permitted to stand, is highly relevant to a commitment under ch. 51. In essence, *Lessard* holds that there may not be an involuntary commitment for mental illness unless there is an appropriate finding that the subject is likely to cause harm either to himself or to others.

The attorney general argues that the finding of dangerousness would inevitably flow, at least in the cases involving the petitioners herein, from the very nature of the violent crimes for which they were charged. We doubt that that is necessarily correct.

Due process under *Lessard* would require a determination of dangerousness at the time of the commitment and could not be based solely on the fact that a defendant had allegedly committed crimes of violence in the past.

This is particularly true in respect to the petitioners herein, since none of them have been found guilty on the merits. In the event that *Lessard* accurately states the law, due process and equal protection of the laws might well require the release of these defendants from custody whether or not the underlying criminal charges have been dismissed.

The validity of *Lessard*, however, is in doubt. Although it raises substantial questions of equal protection, which will eventually have to be resolved, we have not had occasion to do so, and the issue is not, except peripherally, raised in this proceeding. The United States Supreme Court in a per curiam decision on January 14, 1974, vacated the judgment of the three-judge district court in *Lessard*. It was vacated not on the merits, however, but because the mandate of the lower court failed, in the eyes of the United States Supreme Court at least, adequately to frame the issues that were to be decided on appeal. The United States Supreme Court specifically declined to "assess the correctness of the judgment entered by the District Court." (414 U. S. 473, 477, 94 Sup. Ct. 713, 38 L. Ed. 2d 661.)

Accordingly, the rationale of *Lessard*, even in the federal courts, is now in limbo. In these proceedings, we place no reliance upon it as precedent but point out that the problems raised therein are likely to be of imminent concern to the department of health & social services.

Additionally, the petitioners argue that as a matter of law they are entitled to a dismissal on the merits, because they have been denied the right of speedy trial. If, in fact, the constitutional standards which require speedy trial have been subverted by the period of confinement resulting from the inability to stand trial, a judge can, and should, in the exercise of his constitutional obligations, dismiss on the merits.

We conclude, however, that the mere fact of confinement beyond the time when it appears likely that a defendant will recover his competency, whether under the original commitment by the criminal process or by a subsequent civil commitment, does not ipso facto mandate a dismissal on grounds of denial of a speedy trial.

It may well be that in the case of some of the petitioners there has been a denial of speedy trial, and the attorney general has indicated in his brief that in respect to at least some of the petitioners in the case before this court there "perhaps" should be a dismissal on that ground. However, *Jackson* itself refused to consider the speedy-trial question as a matter of law and concluded that such determination should be made when that question is addressed in the individual case.

*Barker v. Wingo* (1972), 407 U. S. 514, 92 Sup. Ct. 2182, 33 L. Ed. 2d 101, comprehensively discussed the constitutional right of speedy trial. The court stated that the right was not susceptible to specified time limits or to broad determinations as a matter of law. Rather, the court said: "[A]ny inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case." (P. 522) The court in declining to set a specific time limit stated:

"[S]uch a result would require this Court to engage in legislative or rulemaking activity, rather than in the adjudicative process to which we should confine our efforts. We do not establish procedural rules for the States, except when mandated by the Constitution. We find no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months. The States, of course, are free to prescribe a reasonable period consistent with constitutional standards, but our approach must be less precise." (P. 523)

The court in *Barker* adopted four factors which are to be considered on an *ad hoc* basis to determine claims

of deprivation of speedy trial: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." (P. 530)

As the state public defender has pointed out, in such cases as incompetency to stand trial, there is some absurdity in insisting on an assertion of that right when the defendant would be incompetent to enjoy that right. We believe, however, that criteria, with its admitted infirmities, together with the other three, must be given weight according to the facts and circumstances of the particular case.

In *Kopacka v. State* (1964), 22 Wis. 2d 457, 460, 126 N. W. 2d 78, and *Taylor v. State* (1972), 55 Wis. 2d 168, 197 N. W. 2d 805, this court indicated that speedy trial claims would have to be decided on a case-by-case basis. We so hold in this case, though, when the matter is presented to a court, due consideration should be given to the circumstances under which the defendant was held awaiting trial. Separate motions addressed to the speedy-trial questions should be brought in respect to the present petitioners.

In the final analysis, it would appear that a dismissal for lack of speedy trial in cases such as these would hinge upon a court's determination of whether the delay resulted in a prejudice to the defendant and would deny the constitutional right to a fair trial.

*By the Court.*—Rights declared.

### Appendix.

"Another reason for excluding psychiatrists from the courtroom is the growing tendency to use them to circumvent a speedy and public trial. This is a right guaranteed every citizen by the Sixth Amendment. But individuals are sent to jail, or to a psychiatric hospital frequently no better than a jail, pending the determination (by psychiatrists!) of the defendants' competency to assist in the preparation of the defense and to under-

stand the nature of charges brought against them, and psychiatrists are ordered to determine and declare themselves on these matters.

"In numerous public statements, Judge David Bazelon has made a point, with which I fully agree, that the competency of a man to stand trial cannot be properly determined or announced by psychiatrists. They may certainly examine an offender and submit a report of their findings, and these findings may assist a judge or a jury to come to some conclusions about the man's competence. But no psychiatrist should presume to accept the responsibility of deciding a highly technical legal question based on these findings. He can say that a man is distracted or deluded or hallucinated, but whether or not this state of mind is compatible with legal 'competence' is something about which a psychiatrist has only common knowledge, and not scientific knowledge.

"Thomas Szasz has emphasized this point from the psychiatric standpoint, declaring that psychiatry is exploited to detain people unjustly, either because psychiatrists cannot make up their minds how to answer this competency inquiry or else because they have declared it to be their opinion that the accused is incompetent to stand trial and hence must remain locked up until competence is restored! Szasz cites several sad cases. All of us know that there are many unconvicted but *alleged* offenders waiting year after year after year for a fair trial which they may never get. Such facts provide some fanatics with ammunition to denounce all psychiatry and mental health efforts as tending toward illegal detention. But delusional as this position of the radical right obviously is, if a psychiatrist has blundered or has been pushed into the untenable position of using psychiatry as a legal weapon, and if psychiatrists are being coerced into confusing diagnostic conclusions (which we are qualified to make) with legal determinations (which we are not qualified to make), then we are all in Szasz's debt for publicizing the error and permitting us to extricate ourselves.

"At the 1966 annual meeting of the American Psychiatric Association, professor of psychiatry John M. Suarez, lecturer at the School of Law of the University of California at Los Angeles, declared that once psy-

chiatry became an established discipline, the legal system 'gradually and subtly' unburdened itself of some of its responsibilities and placed them on the lap of psychiatry. 'Particularly dangerous,' said Dr. Suarez, 'is the court practice of asking psychiatrists to make final decisions about a defendant's competence or responsibility.' By this means a defendant may get the short end of justice. Dr. Suarez said that he knows of many people who have spent decades in mental institutions for minor crimes because testifying psychiatrists judged them 'incompetent.' (We all know of such persons.) As long as such practices prevail, psychiatrists will be 'prevented from making their proper contribution [to law], whatever that may be.' " Menninger, *The Crime of Punishment*, pp. 141, 142.