IN RE CONSERVATORSHIP OF GRAMS: JOERS, Conservator, Appellant, v. DEPARTMENT OF HEALTH & SOCIAL SERVICES, Respondent.

*No. 105. Argued March 4, 1974.—Decided April 12, 1974.*
(Also reported in 216 N. W. 2d 889.)

For the appellant there were briefs and oral argument by *Stanley F. Hack* of Milwaukee.

For the respondent Department of Health & Social Services the cause was argued by *Dennis W. Kozich,* assistant collection and deportation counsel, with whom on the brief were *James R. Pleyte,* collection and deportation counsel, *Robert H. Kletzien,* deputy collection and deportation counsel, and *M. Q. Mooberry,* assistant collection and deportation counsel.

HEFFERNAN, J. The state Department of Health & Social Services has no right to recover on its claim for the period in question. It is undisputed that the defendant Grams is being held only pursuant to a pending criminal charge. There has been no appropriate civil commitment proceedings which would result in an obligation under sec. 46.10 (2), Stats., as claimed by the state.

We have carefully considered the cases upon which the state relies. They are *Guardianship of Sprain* (1935), 219 Wis. 591, 263 N. W. 648; *Guardianship of Radoll* (1936), 222 Wis. 539, 269 N. W. 305; and *Treglown v. Department of Health and Social Services* (1968), 38 Wis. 2d 317, 156 N. W. 2d 363. In each of these cases, there is a consistent rationale—if the individual is com-

mitted to a state institution as the result of criminal proceedings, neither he nor his estate is liable to the Department of Health & Social Services. As stated in *Guardianship of Gardner* (1936), 220 Wis. 490, 492, 264 N. W. 647:

"The question for determination therefore is whether the confinement of the appellant's ward in the central hospital is properly referable to his sentence to the state prison. If he was there confined pursuant to such sentence, there can be no recovery."

We believe that all of these cases taken together stand for the proposition that any confinement or any treatment which is merely an adjunct to the criminal process and is not separately mandated by confinement under the standards of ch. 51, Stats., does not result in a collectible claim.

Grams is held only by virtue of the provisions of sec. 971.14 (5), Stats. The only authority that a court has to hold Grams arises from the fact that he has probably committed a crime and he cannot presently defend himself against the state charges. The only constitutional justification for holding Grams without a civil commitment is enunciated in the standard mandated by *Dusky v. United States* (1960), 362 U. S. 402, 80 Sup. Ct. 788, 4 L. Ed. 2d 824. The standard there stated is:

"[T]he 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' "

We pointed out in *State ex rel. Haskins v. Dodge County Court* (1974), 62 Wis. 2d 250, 214 N. W. 2d 575, that the application of this test is not satisfied by a mere finding of psychosis or mental illness. A person may be completely sane and not be competent to stand trial. He may be insane or psychotic and be able to meet the

test of *Dusky* and be competent to stand trial. *Haskins* holds that restraint of liberty under the competency-to-stand-trial standard is a criminal confinement arising only on the jurisdictional basis that the defendant has probably committed a crime. If the underlying charge were dismissed, a person so confined must be released forthwith, subject only to the temporary detention provisions set forth in sec. 971.14, Stats., for the purpose of instituting possible civil commitment under ch. 51.

In *Haskins*, relying upon *Jackson v. Indiana* (1972), 406 U. S. 715, 92 Sup. Ct. 1845, 32 L. Ed. 2d 435, and *State ex rel. Matalik v. Schubert* (1973), 57 Wis. 2d 315, 204 N. W. 2d 13, we emphasized that the nature of the incarceration was criminal and that the jurisdiction over the defendant was exclusively in the criminal court in which he was charged.

In the instant case, Grams' confinement is exclusively referable to the finding by the Columbia county court that he had been charged with a crime and that, because of his inability to properly defend himself, he could not be tried. The fact that there is a superfluous finding of mental illness by the trial court does not change the nature of the confinement to a civil one, warranting a claim by the state for hospitalization and treatment. The criminal court, in the proceedings that were undertaken, had no such jurisdiction.

We conclude, in accordance with the Wisconsin cases cited above, that there can be no recovery where the incarceration is founded on a pending criminal charge or a criminal sentence. The nature of the confinement and the limited nature of the inquiry to which a court may address itself on a competency-to-stand-trial hearing has been clear at least since *Dusky, supra*. We need indulge in no retroactive application of the law to hold that, during the entire period of Grams' incarceration, he was held solely on the jurisdictional basis of the criminal charges against him.

If further treatment is required, the nature of the confinement must be changed to a civil commitment. Under well-established rules of this court, there then can be a per diem charge against the person hospitalized or against his estate. Under the facts of this case, however, no liability has been incurred to the state for charges prior to a civil commitment under the provisions of ch. 51, Stats.

*By the Court.*—Order reversed.

HALLOWS, C. J. *(concurring).* I believe that unless the commitment is made under the Mental Health Act, ch. 51, Stats., and not under sec. 957.11 (3), Stats. 1967, there is no liability on the part of the estate of the insane person under sec. 46.10 (2). A commitment under sec. 957.11, whether for observation or after observation for treatment, is primarily to serve the state in its prosecution of crime. Liability under sec. 46.10 (2) is predicated on being a patient in any charitable or curative institution.

The difference in the majority opinion and the dissent lies in the distinction between the rationale and the holdings of our prior cases. What is said in a decision is sometimes in the nature of dicta and sometimes in the form of necessary reasons; what the court decides on particular facts may be another matter. Three cases are in dispute: *Guardianship of Sprain* (1935), 219 Wis. 591, 263 N. W. 648; *Guardianship of Radoll* (1936), 222 Wis. 539, 269 N. W. 305; and *Treglown v. Department of Health & Social Services* (1968), 38 Wis. 2d 317, 156 N. W. 2d 363. I would add another. *In re Guardianship of Gardner* (1936), 220 Wis. 490, 264 N. W. 647.

*Sprain* seems to be the root of the evil. In that case, Sprain was charged with murder, sent to Central State Hospital for observation as to his sanity; after five months of observation, the court found him insane and

postponed his trial indefinitely. He was committed to Central State Hospital and remained there about five years. The state board of control filed a claim in his estate under the predecessor statute to sec. 46.10 (2) for his maintenance for both the five-month observation period and the five-year confinement period. It is important in evaluating this case to note that the guardian objected only to the charge for the five-months' observation period. The court held the estate could not be charged for expenses during the five-month period Sprain was held for observation. The court thus routinely approved the charges for the five-year period after Sprain was found insane and recommitted to Central State Hospital. Since there was no issue as to the five-year period, it cannot be fairly said the court decided the issue simply because it allowed the uncontested part of the claim. The reason given for disallowing the charge for the five-months' observation period was because Sprain was held under a criminal warrant and the purpose of such confinement was incidental to his prosecution for a crime.

The rationale of this case is to the effect that one held under a criminal warrant and whose confinement is incidental to the prosecution of a crime is not liable for his maintenance while so held. Thus we have a holding based on a contested issue of no liability under sec. 46.10 (2), Stats., where a person is held for observation under the section equivalent to sec. 957.11 (3). The court did not decide there was liability after Sprain was found insane because the guardian never raised the question.

In the following year, this court decided *Gardner*. While serving a sentence in prison for rape, Gardner was adjudged insane and transferred to Central State Hospital. This court held his estate was not liable for expenses of his incarceration and gave as its reasons that his hospital confinement was referable to his in-

carceration for a crime and his confinement coincided with his prison sentence. This holding does not control the facts of the instant case but the court's reasoning is clear that there is no liability during incarceration under a sentence because the insanity is connected with or referable to incarceration for a crime.

Later the same year this court decided *Radoll.* After a thirty-day period of observation in Central State Hospital, the trial court committed Radoll, who was charged with assault while armed with intent to murder, to Central State Hospital and stayed all criminal proceedings "'until said defendant shall have recovered from such mental disorder.'" This court treated the order as complying with sec. 357.13, Stats., predecessor of sec. 957.11 (3) and in effect finding Radoll was presently insane and was committed for hospitalization and treatment. The court said the sole contention the guardian had any standing to make against the claim of the state board of control for reimbursement for Radoll's care and maintenance was whether the commitment was for observation under sec. 357.13. The court found the commitment was not for observation, did not discuss the holdings in *Sprain* and *Gardner,* and stated that if the commitment was pursuant to sec. 357.13, the guardian was liable under sec. 46.10. This case is not persuasive because neither *Sprain* nor *Gardner,* upon which the court apparently relied without discussion, is a justification for the statement of liability. The assumption in this opinion is that the commitment under sec. 357.13 after a finding of present insanity is somehow the equivalent of a finding of insanity in a civil suit under ch. 51. In this case no mention is made that the confinement as an insane under sec. 357.13 although not for observation, was referable and bottomed on the criminal process. Such a commitment may be partially for a remedial purpose, but the alleged insane person

is incarcerated not so much for his own good but for the public good and so that he can stand trial and answer for his crime. Under this view of incarceration, men have been kept in institutions for years; *see State ex rel. Haskins v. Dodge County Court* (1974), 62 Wis. 2d 250, 214 N. W. 2d 575.

The idea that sec. 957.11, Stats., can be used as a substitute for a civil commitment is no longer valid. In *State ex rel. Matalik v. Schubert* (1973), 57 Wis. 2d 315, 204 N. W. 2d 13, and *Jackson v. Indiana* (1972), 406 U. S. 715, 92 Sup. Ct. 1845, 32 L. Ed. 2d 435, it was held the period for which a defendant may be held in the course of the criminal process because he is insane and unable to stand trial is limited. In the recent case of *State ex rel. Haskins v. Dodge County Court,* this court on constitutional grounds limited the length of time to eighteen months that a person could be incarcerated under sec. 957.11 for the purpose of having him stand trial. We stated from *Jackson* that if it appeared at an earlier time that a defendant is not making progress toward regaining his competency to stand trial, he must be discharged from the criminal commitment. In my view, sec. 957.11 (3) serves a criminal purpose and is part of the criminal law, whether the commitment is made for observation or so that the accused can be treated and tried for his alleged crime.

This view is not contrary to the rationale in the last case decided in this area. In *Treglown,* we discussed the foregoing cases, but *Treglown* does not hold what the dissent states it does.[1] The lower court held the parents

---

[1] The dissent misstates the holding as follows:

"However, as to the type of commitment involved in the case before us, this court in *Treglown* expressly held that the patient or his estate was liable for maintenance costs at Central State Hospital. The exact and express holding was: '(2) estate liability for maintenance at Central State Hospital when, on a finding of present insanity, proceedings are stayed and the patient has been committed until able to stand trial.'"

of a minor liable for his maintenance during his confinement at the Central State Hospital on a commitment made pursuant to sec. 957.11 (3), after being adjudged not guilty of first-degree murder by reason of insanity at the time of the offense. We reversed; consequently, holding there was no liability.[2] Significantly, in *Treg-*

But on page 323, *Treglown* is talking about what prior cases held, not what it held. The complete paragraph from which the minority takes its quote as the holding is as follows:

"Viewed together, these three cases hold (1) no estate liability for maintenance at Central State Hospital when the patient was committed for observation to determine his sanity to stand trial; (2) estate liability for maintenance at Central State Hospital when, on a finding of present insanity, proceedings are stayed and the patient has been committed until able to stand trial; (3) no estate liability for maintenance at Central State Hospital when the patient was committed after having been sentenced to prison and while serving his term."

The quote the minority used as a holding is obviously a reference to *Guardianship of Radoll, supra.*

[2] The minority in several places misstates the holding of *Treglown:* On page 206, "As authority for thus holding an estate liable under circumstances identical with those presented by this appeal, this court in *Treglown* cited an earlier case, *Guardianship of Radoll, . . .*" on page 207, "In holding the patient or his estate liable in the situation now before us, the *Treglown* decision emphasizes that, in such situation, recovery of the patient is the 'sole test for return to court to face further proceedings.'"

The following quotation from *Treglown* makes it clear the minority opinion is not correct (at p. 327):

"If John Treglown had been found sane and convicted, he would have been sentenced beyond doubt to a state penal institution to be confined for the protection of the public and for his rehabilitation, if possible. In that event, the respondent would and could have made no claim upon his father and mother for maintenance costs while he was confined. He was found not guilty by reason of insanity and was committed to the Central State Hospital for the protection of the public and for his rehabilitation and treatment, if possible. The nontreatment factors involved in his commitment and the public safety requirements for his release militate strongly against requiring his father and mother to pay for his maintenance costs while confined."

*lown* we pointed out the differences between commitment under sec. 51.05, Stats., and sec. 957.11 (3), particularly in the provisions governing release in relation to whether the incarceration was for treatment alone or partially for treatment to protect the public. This court reasoned "the non-treatment factors involved in his commitment and the public safety requirements for his release militates strongly against requiring his father and mother to pay for his maintenance costs while confined." Likewise, an insane person treated so the state can prosecute him for a crime has strong public purpose factors. Consequently, we have only *Guardianship of Radoll* holding a commitment under sec. 957.11 (3) after observation and before trial for the purpose of holding and treating such person for trial is a basis for liability.

I would reverse the holding in *Radoll* because it seems to be influenced by *Sprain* and it is out of step with today's concept of the purpose and the limited scope of sec. 957.11 (3), Stats. To my way of thinking, sec. 46.10 (2) was not intended to cover cases under sec. 957.11 (3) or to apply to commitments under sec. 957.11 (3) to Central State Hospital as a charitable or curative institution. Central State Hospital is basically a state hospital for the criminally insane. Sec. 46.10 (2) should not apply to commitments in aid of the criminal process.

I am authorized to state Mr. Justice BEILFUSS joins in this concurring opinion.

Again on page 328:

"In finding that the father and mother are not liable under sec. 46.10 (2), Stats., for the maintenance costs of their minor son while confined in Central State Hospital pursuant to sec. 957.11 (3), we are helped by the rule of law that a statute in derogation of the common law is to be strictly construed. Except for sec. 46.10, there is no basis in common law or statutory law for a claim against parents for maintenance costs of their son while confined in a state hospital for the criminally insane. Construing the statute strictly, as applied to the parents, we find that it does not sustain the petition brought by the State Department of Health & Social Services."

ROBERT W. HANSEN, J. *(dissenting)*. When is a patient or his estate liable for his care and treatment in Central State Hospital? The statute provides for such patient liability "in any charitable or curative institution of the state." [1] Central State Hospital is such institution [2] but not as to all commitments made to it.[3]

When is the Central State Hospital a "charitable or curative institution of the state" and when is it not so? In the *Treglown Case,* this court construed "the nature and purpose of the commitment in a particular case." [4] In each category of cases at least the court ". . . must inquire into the exact purpose and nature of the commitment made to determine whether sec. 46.10 (2), Stats., applies. . . ." [5]

As to three categories of commitments in criminal cases, this court has held no liability on patient or parent for maintenance costs at Central State Hospital. The three categories and no-liability holdings are: (1) "no estate liability for maintenance at Central State Hospital when the patient was committed for observation to

[1] Sec. 46.10 (2), Stats., providing in material part: "(2) Any . . . patient in any charitable or curative institution of the state . . . in which the state is chargeable with all or a part of the patient's maintenance, . . . shall be liable for such patient's maintenance not exceeding the actual per capita cost thereof . . . and the department may bring action for the enforcement of such liability . . . ."

[2] *Treglown v. H&SS Department* (1968), 38 Wis. 2d 317, 321, 156 N. W. 2d 363.

[3] *Id.* at page 321, stating: ". . . it appears clear that the Central State Hospital at Waupun cannot be thus designated as a 'charitable or curative institution' in all situations, regardless of the nature and purpose of the commitment in a particular case. Neither can the Central State Hospital be found to be not a 'charitable or curative institution' in all cases and situations. In each category of cases at least, the court must inquire into the exact purpose and nature of the commitment . . . ."

[4] *Id.* at page 321.

[5] *Id.* at page 321.

determine his sanity to stand trial;" [6] (2) "no estate liability for maintenance at Central State Hospital when the patient was committed after having been sentenced to prison and while serving his term;" [7] and (3) no "parental liability for maintenance costs at Central State Hospital for a minor child committed because of his acquittal based on insanity at the time of the commission of an alleged crime." [8]

However, as to the type of commitment involved in the case before us, this court in *Treglown* expressly held that the patient or his estate was liable for maintenance costs at Central State Hospital. The exact and express holding was: "(2) estate liability for maintenance at Central State Hospital when, on a finding of present insanity, proceedings are stayed and the patient has been committed until able to stand trial." [9]

As authority for thus holding an estate liable under circumstances identical with those presented by this appeal, this court in *Treglown* cited an earlier case, *Guardianship of Radoll*, [10] and said of it:

"In *Guardianship of Radoll*, Radoll was charged with assault while armed with intent to murder. He was committed to Central State Hospital for a period of observation not to exceed thirty days. At the termination of this observation period, he was returned to court, adjudged insane. All proceedings were stayed and he was committed to the Central State Hospital for the criminally insane until he recovered and could face trial. The State Board of Control filed claim for care and maintenance at the hospital of the incompetent. Once again, this court stated that the guardian was not liable for care and support of the ward during the observation period. Once again, this court stated that the guardian was liable where, upon a finding of present insanity,

[6] *Id.* at page 323.

[7] *Id.* at page 323.

[8] *Id.* at page 323.

[9] *Id.* at page 323.

[10] *Guardianship of Radoll* (1936), 222 Wis. 539, 269 N. W. 305.

the trial was postponed and the incompetent was confined in the Central State Hospital for the insane until he recovered and could face trial." [11]

The "Once again" reference in *Treglown* is to still an earlier case, *Guardianship of Sprain,*[12] where this court upheld a trial court's ruling that an estate was not liable for maintenance costs at Central State Hospital for the period of observation as to competency to stand trial; but also upheld the trial court's approving charges against the estate for the period of hospitalization ". . . following his being found insane and his re-commitment to the Central State Hospital for hospitalization as insane." [13]

In holding the patient or his estate liable in the situation now before us, the *Treglown* decision emphasizes that, in such situation, recovery of the patient is the "sole test for return to the court to face further proceedings." [14] This return to court upon recovery is

[11] *Treglown v. H&SS Department, supra,* at pages 322, 323.

[12] *Guardianship of Sprain* (1935), 219 Wis. 591, 263 N. W. 648.

[13] *Treglown v. H&SS Department, supra,* at pages 321, 322, this court saying, as to *Guardianship of Sprain, supra,* that: ". . . The guardian objected only to the charge for the five-month observation period. . . . While liability for the longer period was not disputed, the court approved charges against the estate for the period of confinement following his being found insane and his re-commitment to the Central State Hospital for hospitalization as insane."

[14] *Id.* at pages 324, 325, this court stating: ". . . Recovery from such incapability of understanding is the sole test for return to the court to face further proceedings. Sec. 957.13 (3) provides: 'When the hospital superintendent considers that the defendant has recovered sufficiently to understand the proceedings against him and to assist in his own defense the hospital superintendent shall notify the committing court thereof. The court shall thereupon issue an order remanding the defendant to the custody of the sheriff pending further proceedings in the cause, but if the court finds that the defendant has not so recovered the defendant shall be recommitted to the hospital.' The mandatory provisions for return to court upon sufficient recovery establish that commitments under this statutory provision are made for treatment

compared to civil commitments where ". . . [r]ecovery from mental illness is the sole test for release." [15] Provisions for the return to court of the patient in the case before us are termed "less flexible," but "the clear test is the recovery of the patient. . . ." [16] As to both situations, it is ". . . release as soon as recovery or the welfare of the patient permits [that] establishes the nature and purpose of the confinement: treatment for the illness involved." [17] It is the commitment for treatment with recovery the prerequisite to release that, as *Treglown* expressly holds, renders the patient or his estate liable for maintenance costs ". . . when, on a finding of present insanity, proceedings are stayed and the patient has been committed until able to stand trial; . . ." [18]

The plurality opinion finds in *Treglown,* and in *Radoll* and *Sprain,* both cited and relied upon in *Treglown,* ". . . a consistent rationale—if the individual is committed to a state institution as the result of criminal proceedings, neither he nor his estate is liable to the Department of Health & Social Services. . . ."

---

alone. No factor other than insufficiency of recovery justifies further confinement."

[15] *Id.* at pages 323, 324, this court stating: "Under the Mental Health Act, ch. 51, Stats., upon a finding by court or jury of insanity from a medical standpoint sufficient for civil commitment, the person is committed to a hospital for treatment until recovered. *Recovery from mental illness is the sole test for release.* In fact, in some cases, the patient, confined in a treatment facility in a civil commitment proceeding, may be released before fully recovered. . . ." (Emphasis supplied.)

[16] *Id.* at page 324, this court saying of commitments where, on a finding of insanity, proceedings are stayed and the patient committed until able to stand trial: "In the case of commitments, made under sec. 957.13, Stats., as involved in the *Sprain* and *Radoll* cases, *supra,* the provisions for release are less flexible but the clear test is the recovery of the patient. . . ."

[17] *Id.* at page 324.

[18] *Id.* at page 323.

How can that be said of *Sprain* where the court ". . . approved charges against the estate for the period of confinement following his being found insane and his re-commitment to the Central State Hospital for hospitalization as insane?" [19]

How can this be said of *Radoll*, where this court held ". . . that guardian was liable where, upon a finding of present insanity, the trial was postponed and the incompetent was confined in the Central State Hospital for the insane until he recovered and could face trial?" [20]

How can this be said of *Treglown* where this court held that there was ". . . estate liability for maintenance at Central State Hospital when, on a finding of present insanity, proceedings are stayed and the patient has been committed until able to stand trial . . . ?" [21]

The concurring opinion recognizes only *Radoll* as holding there is estate liability for treatment at Central State Hospital under a commitment, following a finding of present insanity prior to trial of a criminal charge. It would overrule that case and reverse its holding. But it would do more. It would destroy the emphasis upon the purpose of the commitment—*i.e.*, treatment until recovery—which *Treglown* finds to identify and equate this pretrial commitment for treatment and a civil commitment for the same purpose. Clearly, *Sprain, Radoll* and *Treglown* are judicial constructions of a particular statute. "Public policy" is a doubtful basis for changing the construction given a statute by this court. This court repeatedly stated: ". . . It is established that when a court places a certain construction upon a statute, such construction becomes part of the statute, and subsequent

---

[19] *Id.* at page 322.

[20] *Id.* at pages 322, 323.

[21] *Id.* at page 323.

legislative inaction can be deemed to be approval of such construction. . . ." [22]

This court having construed and applied the statute (sec. 46.10 (2), Stats.) to the exact situation presented by this appeal, the writer would change neither that clear construction nor that equally clear application. The writer would affirm.

I am authorized to state that Mr. Justice LEO B. HANLEY and Mr. Justice CONNOR T. HANSEN join in this dissent.

---

[22] *Estate of Pamanet* (1970), 46 Wis. 2d 514, 517, 175 N. W. 2d 234, 177 N. W. 2d 105, citing *Sun Prairie v. Public Service Comm.* (1967), 37 Wis. 2d 96, 100, 154 N. W. 2d 360, stating: ". . . This court has long been committed to the principle that a construction given to a statute by the court becomes a part thereof, unless the legislature subsequently amends the statute to effect a change." *See also: Zimmerman v. Wisconsin Electric Power Co.* (1968), 38 Wis. 2d 626, 157 N. W. 2d 648; *Kindy v. Hayes* (1969), 44 Wis. 2d 301, 171 N. W. 2d 324.