610 A.2d 882
IN THE MATTER OF THE COMMITMENT OF F.H.
TO THE FORENSIC PSYCHIATRIC HOSPITAL.

Superior Court of New Jersey
Appellate Division

Argued June 30, 1992—Decided July 23, 1992.

Before Judges LONG and R.S. COHEN.

*John S. Furlong* argued the cause for appellants J.H. and F.H.

*James T. Hill, Jr.,* Deputy Attorney General, argued the cause for respondent Department of Human Services (*Robert J. Del Tufo,* Attorney General, attorney, *Mary C. Jacobson,* Deputy Attorney General, of counsel, and *James T. Hill* on the brief).

The opinion of the court was delivered by

COHEN, R.S., J.A.D.

F.H. was sentenced for a sex crime to a term at the Adult Diagnostic and Treatment Center. Because there was no available bed there, he was temporarily confined as a state prisoner at the Ocean County Jail. After a suicide attempt, F.H. was involuntarily committed, on the application of the acting warden of the jail, to the Forensic Psychiatric Hospital in Trenton, a state hospital. He remained there until his discharge 42 days later.

 The Law Division judge ordered that a $10,454.64 lien be placed on F.H.'s property for his care at the full rate charged at the hospital. The order also assessed J.H., F.H.'s wife, a non-cumulative contribution of $803.88 toward F.H.'s care, at the rate of $19.14 per day for 42 days. F.H. and J.H. appealed, arguing that only the Department of Corrections had the obligation to pay the bill for F.H.'s stay at the psychiatric hospital. We agree, and therefore reverse.

 There are two statutes that apparently bear on the subject. The first is *N.J.S.A.* 30:4–7, which was adopted in 1918, and which permits the Department of Corrections

> to place any [prison] inmate in any hospital for such medical or surgical treatment as may be necessary, which cannot properly and adequately be rendered within the institution, and to pay for the care, maintenance and

treatment of such persons, the approval of the commissioner [of the Department of Corrections] first having been obtained.

The phrase "medical or surgical treatment" in *N.J.S.A.* 30:4–7 must be read to include psychiatric treatment. The immediately following statutory sections, *N.J.S.A.* 30:4–7.1, –7.2, and –7.3, were adopted in 1969. They all deal with the authority of the chief executive officer of state and county penal institutions and institutions for the mentally ill and mentally retarded to consent to "medical, psychiatric, surgical and dental treatment" for incompetents and minors. The quoted phrase deals with much the same subject matter as the immediately preceding *N.J.S.A.* 30:4–7, and must be viewed as a recent updating of the 1918 statutory phrase "medical or surgical treatment."

█ Our view of the legislative intent is confirmed by *McCorkle v. Smith*, 100 *N.J.Super.* 595, 242 *A.2d* 861 (App.Div.1968), whose facts preceded the 1969 amendments. In *McCorkle*, we concluded that the Department of Corrections had the authority under *N.J.S.A.* 30:4–7 to transfer a prison inmate to a state mental hospital when the need arises. We did not directly deal with the issue of payment, but we did describe the statutory scheme as contemplating mental care transfers "at the expense of the State." *Id.* at 599, 242 *A.2d* 861. Additionally, if the authority to transfer an inmate to a mental hospital for psychiatric treatment arises from *N.J.S.A.* 30:4–7, then so does the authority to pay for the care. The "approval of the commissioner" mentioned by the statute is both for placement of the inmate in the hospital and for payment of the charges. The legislative language does not contemplate approval for placement but not for payment.

The Department of Human Services seeks to avoid *McCorkle* by distinguishing between "transfer" and "commitment" of an inmate to a hospital for psychiatric care. There is no such difference. Whether described as a transfer or a commitment, the mechanism is one initiated by the prison authorities to require hospitalization for psychiatric treatment of a prison inmate. On the other hand, *State v. LeVien*, 44 *N.J.* 323, 209

*A.2d* 97 (1965), which the Department says is dispositive, is quite different. There, an involuntarily committed patient killed a fellow hospital patient. The hospital sought payment for his continued post-homicide hospitalization from the Department of Corrections on the thesis that he was a criminal who was kept in custody at the hospital. The claim was denied, because there were no criminal proceedings and the Department of Corrections had no role in hospitalizing the patient or keeping him there.

■ The second statutory provision on the subject is *N.J.S.A.* 30:4–66. It concerns payment for the care and maintenance of the generality of psychiatric patients committed to public institutions. It states that "[e]very patient supported in a State or county charitable institution shall be personally liable for his" care, and that, if the patient's estate is not sufficient, named family members shall be charged for his care according to their means. *N.J.S.A.* 30:4–60 provides that patients whose estates and chargeable relatives are unable to pay are committed at the cost of the county of settlement or the State. Sections that follow create a means of assessing a per diem rate for patient and family responsibility, including administrative hearings on ability to pay.

In addition, *N.J.S.A.* 30:4–80.1 gives every publically supported charitable institution a lien against the property of persons "committed or admitted by virtue of Title 30" for the total cost of care and maintenance.

■ Although these provisions seem to apply, they must be read not to govern hospitalized prison inmates. The State has a constitutional obligation to provide medical care for prisoners, because they cannot provide care for themselves during their imprisonment. The Eighth Amendment's guarantee against cruel and unusual punishments prohibits deliberate official indifference to prisoners' serious medical needs. *Estelle v. Gamble,* 429 *U.S.* 97, 103–04, 97 *S.Ct.* 285, 290–91, 50 *L.Ed.*2d 251 (1976); *see DeShaney v. Winnebago County Dep't of Social*

*Servs.,* 489 *U.S.* 189, 109 *S.Ct.* 998, 103 *L.Ed.*2d 249 (1989). There is no difference in this respect between treatment for physical ills and for psychological or psychiatric ills. *Torraco v. Maloney,* 923 *F.*2d 231, 234–35 (1st Cir.1991); *Partridge v. Two Unknown Police Officers of Houston,* 791 *F.*2d 1182, 1187 (5th Cir.1986); *Bee v. Greaves,* 744 *F.*2d 1387, 1395 (10th Cir.1984), *cert. denied,* 469 *U.S.* 1214, 105 *S.Ct.* 1187, 84 *L.Ed.*2d 334 (1985); *Inmates of Allegheny County Jail v. Pierce,* 612 *F.*2d 754, 763 (3d Cir.1979); *Bowring v. Godwin,* 551 *F.*2d 44, 47 (4th Cir.1977). There also can be no difference between psychiatric treatment voluntarily sought and involuntary commitment at the instance of the prison authorities. In the latter case, the necessity for the expenditure cannot subsequently become a genuine issue.[1]

We need not decide whether it would be a denial of equal protection for the State to pay for hospitalization and treatment of prison inmates for physical illness and injury but not for psychiatric conditions. We discern no legislative intent to make such a distinction, and so we need not say if it would be valid. We note the view of the Fourth Circuit Court of Appeals in *Bowring, supra,* 551 *F.*2d at 47, that, in the context of a prisoner's Eighth Amendment right to medical treatment, there is "no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart."

It was held, even before the federal courts developed their Eighth Amendment analysis of the problem, that an inmate who is not charged the cost of prison maintenance, and whose time spent in a public psychiatric hospital counts as part of the sentence, is not liable for hospital psychiatric care and maintenance under a statute assessing the generality of patients for their hospital care. *See Department of Welfare v. Brock,* 306

---

[1]Before initiating commitment proceedings, prison authorities "shall have exhausted all reasonable means towards managing the inmate's psychiatric symptoms within the correctional facility." *N.J.A.C.* 10A:16–13.3(a).

*Ky.* 243, 206 *S.W.*2d 915 (1947); *In re Conservatorship of Grams,* 63 *Wis.*2d 194, 216 *N.W.*2d 889 (1974); *In re Gardner,* 220 *Wis.* 490, 264 *N.W.* 647 (1936).

What we have in New Jersey, then, is a situation in which two statutory schemes coexist without expressly recognizing each other. One, *N.J.S.A.* 30:4-49 *et seq.,* governs the generality of patients committed to psychiatric hospitals. The other, *N.J.S.A.* 30:4-7, treats the specific problem of responsibility for necessary health care costs for prison inmates. The more particular statute is entitled, as a matter of sound statutory construction, to be treated as an exception to the general rule. *See Wilson v. Unsatisfied Claim & Judgment Fund Bd.,* 109 *N.J.* 271, 278, 536 *A.*2d 752 (1988). The same result may be required to satisfy the rights of prisoners to psychological and psychiatric care which cannot be provided in the prison.

A prisoner serving a sentence who is involuntarily committed to a psychiatric hospital may not be charged for the costs of care and maintenance under *N.J.S.A.* 30:4-60 *et seq.,* and neither may the prisoner's family. An inmate is entitled to such care under *N.J.S.A.* 30:4-7, and the involuntary commitment or transfer constitutes the approval of the Commissioner that the statute requires in order for the cost of such care to be borne by the State.

Reversed.