521 P.2d 1131

The STATE of Arizona, Appellee,

v.

Joe Anthony ZAERR, Appellant.

No. 2853.

Supreme Court of Arizona,
In Banc.

May 13, 1974.

Rehearing Denied June 11, 1974.

**586**

Gary K. Nelson, Atty. Gen., by R. Wayne Ford, Asst. Atty. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender, by Rudy Gerber, Special Deputy Public Defender, Phoenix, for appellant.

CAMERON, Vice Chief Justice.

This is an appeal from jury verdicts and judgments of guilt to the crime of murder in the second degree, Counts I and II, §§ 13–451, 13–452, and 13–453 A.R.S., and sentences thereon of not less than fifty years nor more than life; and a verdict and judgment of guilt to the crime of assault with a deadly weapon § 13–249 A.R.S., and a sentence thereon of not less than thirty nor more than sixty years, all three sentences to run concurrently.

The defendant raises four issues on appeal:

1. there was error in the admission of inflammatory exhibits;

2. the State unlawfully suppressed evidence beneficial to the defendant;

3. there was an erroneous comment upon the defendant's exercise of his Fifth and Sixth Amendment rights; and

4. the sentence was excessive.

The facts necessary for a determination of this matter on appeal are as follows. Defendant, Joe Anthony Zaerr, at the time of the incident, was a 22 year old Marine stationed at the El Toro Marine Base in Orange County, California. He was 6'2", 210 pounds, and his wife, some four years younger than he, was 5'2", and weighed between 106 and 109 pounds. The two had been married in Missouri in 1971 while the defendant was between enlistments. The marriage was not a smooth one. The defendant contends that the wife accused him of paying too much attention to other girls, and that she was extremely jealous. The testimony indicates that the defendant physically abused his wife on more than one occasion. Twice he choked her until she blacked out; he held a knife to her throat on at least one occasion; and one time he beat her two days before she suffered a miscarriage. He told numerous associates with whom he worked that he was going to kill his wife, once stating that he was going to cut her head off, put it in a box, and send it to his wife's mother so that her mother would die of a heart attack. In January 1973 Mrs. Zaerr left the defendant and came to Phoenix, Arizona, where she stayed with her grandparents, Mr. and Mrs. George Wass.

There were several phone calls between the defendant and his wife concerning her allotment checks and the need of the wife for funds which he refused to send her. Despite his pleas she refused to return to him. The defendant then bought a shotgun in California, together with shells, and came to Arizona. On arriving in Phoenix he located his wife by telephone. He testified he stopped at a nearby house and left the shotgun in a package with the occupant before he arrived at the grandparents

house. Testimony as to why he brought the shotgun was as follows:

"A Well, I figured if I took a shotgun and shells that I might be able to talk to Mary and tell her I meant business, show her that I meant business. When I wanted her to come back she said no, she didn't love me anymore.

I figured if I had a shotgun and shells it would be hard to say no. That was the wrong way to do it, to scare her to come back with me, but that's all I knew. I didn't know anything else to try. I tried everything. I tried begging and I didn't know what to do and when she said, 'There's going to be somebody here to stop you,' I didn't know what that meant either.

"So I came out with the intention to scare her into coming back with me. Just a show of my temper, I guess. That's the only way I had to express myself."

After asking his wife several times, both at the house and a nearby drive-in, to come back to him and having his wife refuse, he left, picked up the shotgun, loaded it, and returned to the home. When asked why he loaded the shotgun, he stated:

"Q Why did you load the shotgun?

"A Because I was going to show Mary and the grandparents that I meant business. It was loaded and I meant what I said and they were going to listen.

I wanted them to listen to me and I figured they wouldn't if they didn't think I meant business so if I had to fire the gun to make them realize that I meant business, I was going to be prepared to do that, too."

As to his wife's reaction he testified:

"A No. She wasn't laughing or crying. She said, 'Where did you get the gun?' I said, 'California.' She started laughing. She said, 'You brought that all the way out here?' And she started laughing.

I said, 'Yes, I did.' She said, 'You wouldn't shoot anybody with that. You couldn't do that. You couldn't and you wouldn't.'

"Q Was she still laughing?

"A She was still laughing. I said, 'Shut up, Mary,' and she kept on laughing. So I said, 'Well, how would you like to look down the barrel?' And I pointed it at her and she said, 'Oh, get that out of my face'."

He stated that he started to talk to his wife about reconciliation and he wanted the grandparents to help, but the grandmother stated, "Well, if you kids are going to get worse, you might as well get a divorce and get it over with." This started an argument and the grandfather stated, "I don't want any commotion like that raised in my house. You can just leave." At this point, the wife fled to the bathroom to hide, and, according to the defendant, in the hassle that ensued between him and the grandparents, the gun went off accidentally, mortally wounding the grandmother. Then he had to shoot the grandfather to defend himself from the attacks of the grandfather. After this, according to the defendant, the following transpired:

"A The door was closed and I knew Mary had run into the bathroom and slammed the door, so I walked back down the hall and I banged on the door.

"I said, 'Mary,' and she opened the door right away. As a matter of fact, she almost opened it before I even hit the door. She said, 'What was that? What was that?'

"I said, 'You know, there's two people that are dead because of you.' I said, 'If you hadn't come by here, I wouldn't have came by here in the first place.'

"I said, 'This whole thing wouldn't have happened'."

After some discussion they called the police. The defendant was charged with the murder of the two grandparents and assault with a deadly weapon on the wife. At the trial the wife testified for the State,

and the defendant testified on his own behalf. From the jury verdicts, judgments, and sentences, the defendant appeals.

## ADMISSION OF THE PHOTOGRAPHS INTO EVIDENCE

■ The defendant contends that the admission of colored photographs showing the two victims at the morgue and the extent of their wounds were gruesome and prejudicial and had no probative value since the defendant was willing to stipulate to the identification of the deceased, the manner of the deaths, and the fact that the defendant had caused the deaths. The pictures, admittedly gruesome, were admitted during the testimony of Dr. Jarvis, the pathologist; and appear to support Dr. Jarvis' testimony concerning the cause of death of the two victims.

We have stated:

"Photographs having probative value are admissible in evidence whether they are in black and white or color. State v. Brady, 105 Ariz. 190, 461 P.2d 488 (1969). They must, of course, be relevant to an issue in the case and may be admitted in evidence to identify the deceased, to show the location of the mortal wounds, to show how the crime was committed and to aid the jury in understanding the testimony of the witnesses. State v. Robinson, 89 Ariz. 224, 360 P.2d 474 (1961). If the photographs have any bearing upon any issue in the case they may be received although they may also have a tendency to prejudice the jury against the person who committed the offense. The discretion of the trial court will not be disturbed on appeal unless it has been clearly abused. See Miranda v. State, 42 Ariz. 358, 26 P.2d 241 (1933)." State v. Mohr, 106 Ariz. 402, 403, 476 P.2d 857, 858 (1970). See also State v. Williams, 107 Ariz. 262, 265, 485 P.2d 832, 835 (1971).

The court is, of course, in the best position to determine the possible prejudicial effects upon the jury of the admission of photographs. Reviewing the pictures admitted as well as the transcript, we cannot say that the trial court abused its discretion even though we may not have admitted them had we been the trial judge. Our function is to determine whether there was an abuse of discretion. We find none.

■ Defendant also contends that having his wife (the victims' granddaughter) identify the pictures instead of the pathologist, and the resulting weeping on the stand, was prejudicial and inflammatory. In a proceeding outside the presence of the jury, the defendant objected to showing these photographs stating:

"On that basis it is the feeling that if these photographs are displayed to Mary Zaerr, their effect can only be prejudicial, irrelevant and immaterial, and that the photographs would only be offered for the purpose of exciting the emotions of Mary Zaerr and ultimately exciting the emotions of the jurors.

"Further the defense stipulates and does not contest that the people alleged in the Indictment were in fact the people upon whom Dr. Tom Jarvis performed his autopsy and that his testimony would be relative to those two people."

The county attorney refused to enter into a stipulation. The following transpired:

"THE COURT: Counselor, if you have reason to believe she's going to break down into hysteria—

"MR. HYDER: Well, I've told her to refrain from as much emotion as she possibly can, but I don't think that the State can be held accountable for somebody's emotions.

I don't contemplate that she'll break down, I've tried to show her the picture of her grandmother which will show no wounds. I'm sure that anybody who had had a family member killed by any means such as this would have some emotional trauma.

"MR. HERTZBERG: Have they been shown to her yet?

"MR. HYDER: I've shown those two pictures.

"MR. HERTZBERG: Do you have reason to believe she'll not break down?

"MR. HYDER: She did not break down in my office when she viewed them."

The two pictures were shown to the defendant's wife, Mary Zaerr, then aged 19. One showed the head of the grandmother with the rest of the body covered and the other showed the head of the grandfather with blood in and around his mouth. Upon seeing the pictures she did break down, and a motion for a mistrial was made. Mr. Hyder for the State stated:

"Your Honor, the State submits that the witness is presently crying. Mr. Hyder never avowed that the witness would not break down. I was asked if I had shown her the pictures. I assured the Court that I had and at the time that I showed them to her, she did not have an emotional outburst.

"I will also inform the Court that I didn't feel as though I could be held nor the Court could be held responsible for any result from looking at the picture that she might have, and the State submits that even though the defense is willing to stipulate to the identity of the deceased, the State is entitled to have those pictures viewed and identified by the witness, not only to show identity but in the case of other photos, to show the nature of the wounds inflicted by the defendant and also to show that the pictures of Mr. Wass substantially reflect Mr. Wass as viewed by Mary Wass (sic) on the 20th of February of this year."

The trial court denied the motion for a mistrial.

Because of the nature of the photographs, the head only, showing no wounds, they were admissible only for the purpose of identification which the defendant already stated they were willing to admit, and the pictures had no other probative value. It would appear that having the granddaughter identify the pictures was done not for evidentiary reasons, but for the emotional impact it would have on the jury and in callous disregard for the witness's feelings. While we agree that the prosecutor overstepped the bounds of propriety, we do not feel, under the facts of the case, that the error was prejudicial, and the effect of these pictures would be relatively minor. As to the emotional behavior of the witnesses, we believe that the trial court was in a better position to observe the prejudicial effect that this had on the jury and we find no abuse of discretion.

## THE ALLEGED SUPPRESSION OF THE EVIDENCE

■ The fingerprint expert for the Phoenix Police Department took charge of the shotgun immediately after the crime and dusted it for fingerprints. He testified as follows:

"Q All right. Now when you examined and dusted for fingerprints with respect to this particular shotgun is your main concern to see whether or not you can find any sufficient prints by which you could ultimately make a comparison?

"A That's right. The only prints I save are those that I feel are of evidential nature. Not necessarily an identification being made. I've kept prints which might aid in elimination or might not be sufficient points for a positive identification, but there may be enough there to give us a clue as to the type pattern it might be and it could aid in elimination.

"Q So basically your only concern in dusting for prints is twofold: One, to determine and lift prints that are of sufficient quality to make an identification and B. to determine and possibly lift prints that although they may not be sufficient to make an identification they may be sufficient for the purposes of elimination. Is that correct?

"A Basically that's true, yes.

  *  *  *  *  *  *

"Q What happened with respect to your examination of the shotgun mentioned in your February 20 report?

"A I dusted the weapon completely. It appeared to be a fairly new weapon and so I dusted it from one end to the other to see if there were any possible latents that could be identified.

I made a few lifts from the weapon but on returning to the office with them I determined that there were none of evidential value, and so there were no prints kept from the shotgun.

"Q Do you have those prints that you lifted?

"A No, they were discarded. They had no evidential value and were discarded.

$$*\quad *\quad *\quad *\quad *\quad *$$

"A They were of no value. I couldn't make a comparison and they weren't of value to make an elimination.

There wasn't enough there to be of any value so they were discarded."

We find no concealment of evidence by the State as was apparent in State v. Fowler, 101 Ariz. 561, 422 P.2d 125 (1967), or bad faith by the prosecutor or the fingerprint expert. Admittedly, according to defendant's testimony, since the two victims fought over the gun, it would have many fingerprints on it, including those of the defendant. This is the uncontradicted testimony of the defendant and the only testimony concerning the fight after the wife fled to the bathroom. We find no error.

## COMMENT ON THE RIGHT TO REMAIN SILENT

 Mary Zaerr testified:

"Q Did the police finally come?

"A Yes.

"Q After they arrived what occurred?

"A Well, I got in front and he got in the back and they drove us back to the house and then they had us get out and one of the policemen started to read us our rights.

That's when I started breaking down and I said that I didn't care about my rights; I knew I hadn't done anything, and all Joe said was, 'I want to see a lawyer'."

Immediately defense counsel moved for a mistrial on the basis of the comment of the defendant's exercise of his constitutional right to refuse to talk and request an attorney. The statement appeared to be inadvertent and considering the context in which it was given, not prejudicial. We do not find that it was a violation of the defendant's right to remain silent. State v. Shing, 109 Ariz. 361, 509 P.2d 698 (1973). We find no error or prejudice.

## EXCESSIVE SENTENCE

 Defendant contends that the sentence is excessive, conceding that the sentences are within the maximum and minimum allowed by law. We have read the transcript, particularly the defendant's testimony, and we do not believe that the sentences were excessive.

Judgments affirmed.

HAYS, C. J., and STRUCKMEYER, LOCKWOOD and HOLOHAN, JJ., concur.