559 P.2d 152

**The STATE of Arizona, Appellee,**

v.

**John Gilbert FREEMAN, Sr., Appellant.**

**No. 3012–2.**

Supreme Court of Arizona,
In Banc.

Nov. 29, 1976.

Moise Berger, Former Maricopa County
Atty., Donald W. Harris, Acting Maricopa

County Atty., by G. Eugene Neil, Deputy County Atty., Phoenix, for appellee.

Flynn, Kimerer, Thinnes & Derrick by Thomas A. Thinnes, Phoenix, for appellant.

CAMERON, Chief Justice.

This is an appeal by defendant John Gilbert Freeman, Sr., from a judgment of guilt following a jury trial on seven counts of first degree murder, A.R.S. §§ 13–451 and 452. Defendant was sentenced to seven consecutive terms of life imprisonment.

The following questions are raised by this appeal:

1. Did the defendant's confinement in the Arizona State Hospital constitute a violation of due process?

2. Was defendant denied his right to a speedy trial?

3. Did Dr. Hoogerbeets' examination of the defendant on 20 December 1974 violate his Fifth Amendment privilege against self-incrimination?

4. Did Dr. Hoogerbeets improperly testify to statements made to him by the defendant during defendant's mental examination?

5. Was the defendant denied his right to a fair trial by virtue of the remarks made by the county attorney in his closing argument to the jury?

The facts necessary for a resolution of the issues raised by this appeal are as follows. On 3 September 1971, at approximately 11:00 p. m., seven people were shot and killed at the Bentley residence, 5308 East Polk, Phoenix, Arizona. Six died of multiple gunshot wounds, the seventh died of a single wound. The victims were Mrs. Novella Bentley, 43, mother; Mrs. Pam Bentley Martin, 16, a married daughter; Frank Martin, 19, son-in-law; Tina Bentley, 8; Adam Bentley, 3; Tracy Bentley, 20 months; and Charlotte Bentley, 9 months. Debra Bentley, to celebrate her birthday, spent the night with a friend. She was the only family member who survived.

On the night in question, after hearing a number of gunshots, several of the Bentley's neighbors saw the defendant, John Gilbert Freeman, leave the Bentley house, run down the street to a parked car, get something from the car and return to the house. Shortly after he returned to the house they heard a second series of shots. At that point, a number of police officers began arriving on the scene. One of the officers noticed the defendant running through the backyard. He ordered the defendant to stop but the command was ignored. The defendant vaulted the back fence, laid down on the ground and fired three shots in an unknown direction. A second police officer, already in the alley, ordered the defendant to stop shooting and he complied. As the officer approached, defendant said, "Thank God you stopped me." He paused and then continued, "I guess that'll teach that son of a bitch," another pause, "to run off with my wife and kids." He was searched and placed under arrest. Two .38 caliber pistols later identified as the murder weapons were found in the alley.

Additional facts brought out at trial established that the defendant had employed Mr. Charles Bentley, Mrs. Novella Bentley's husband, as an upholsterer in 1970 and early 1971. Mr. Bentley abandoned his family in February of 1971 and at approximately the same time quit showing up for work. In April of that year, the defendant's wife who had also worked in the upholstery shop disappeared with the defendant's two children. Prior to Mr. Bentley's disappearance, the defendant had caught his wife and Mr. Bentley kissing in the upholstery shop.

Beginning in June, the defendant started visiting the Bentley house regularly. Between June and September 1971, he made 20 such visits. He would talk at length with Mrs. Bentley and inquire repeatedly as to the whereabouts of Mr. Bentley. At approximately the same time, the defendant was conducting a search for his wife and children. He contacted the Scottsdale Police Department and talked with an Officer Allsup both at work and at his home in an effort to secure assistance in his search. None of these efforts were successful and

Officer Allsup described him as "very desperate" in trying to locate them.

In early July, according to Debra Bentley's testimony, the defendant and Mrs. Bentley, as they had previously, again discussed the possibility that Mr. Bentley and the defendant's wife had run off together. That night, the two of them went to a psychic in hopes of finding out where Mr. Bentley and the defendant's wife were. The psychic told them that Mr. Bentley was in Utah and the defendant's wife was in Chicago with her sister. Approximately two weeks later the defendant returned to the Bentley Home. He had called his wife's sister in Chicago and his wife was not there. The discussion again turned to the possibility that their missing spouses were together. In the course of the conversation, the defendant said, "You know, I ought to come back here and shoot every one of you just for revenge."

In August the defendant traveled to Dayton, Ohio, and spent ten days there. During that time he contacted a Detective Smith of the Dayton Police Department and presented certain evidence to him in hopes of locating his wife. Detective Smith was unable to help the defendant telling him that it was a civil matter. The defendant responded that if something wasn't done he was going to get a gun and someone was going to get hurt. On 2 September, the defendant returned to Phoenix and went to the Bentley house. At trial, Debra testified that he asked Mrs. Bentley for an article of Mr. Bentley's clothing. She refused to give him anything and he responded, "Well, you are not going to cooperate, huh?" She replied, "Yes, that's right." He then said, "If I ever catch my wife with your husband, I'm going to shoot her right between the legs so she wouldn't be able to do anything with another man again."

On 3 September, prior to the shooting, the defendant rented a hotel room under an alias and purchased the two guns and fifty rounds of ammunition. He also went to the airport, bought a ticket to Tucson on a flight leaving at 11:25 p. m., and rented the car later found parked down the street from the Bentley house.

A complaint was filed on 4 September 1971 charging defendant with first degree murder. (No. C–256124) A preliminary hearing was commenced on 12 October 1971, but was continued pending litigation in this court concerning the issues of publicity, free press and fair trial. See *Phoenix Newspapers, Inc. v. Jennings,* 107 Ariz. 557, 490 P.2d 563 (1971). Prior to the reconvening of the preliminary hearing, the court ordered a mental examination of the defendant pursuant to A.R.S. § 13–1621. As a result of that examination, the defendant was found incompetent to stand trial and was committed to the Arizona State Hospital on 14 January 1972 until such time as defendant could be restored to competency.

Sometime prior to 11 March 1974, the hospital reported to the Superior Court that defendant was believed competent to stand trial. A hearing was set for 28 March 1974. However, a motion to dismiss based on speedy trial grounds was filed by defendant prior to that hearing. On 18 April 1974, the Honorable Charles D. Roush, Judge of the Superior Court, granted defendant's motion to dismiss on the basis that defendant had been denied his right to a speedy trial. Judge Roush's order granted the State leave to refile the charges because the "delays were not occasioned by the request of the State * * *." The State then sought and obtained a grand jury indictment against the defendant (CR–81137) and he again moved to dismiss. On 7 June 1974, the Honorable C. Kimball Rose dismissed the grand jury indictment. In doing so, he indicated that he felt bound by Judge Roush's determination that the defendant's right to a speedy trial had been violated and thus that the indictment must be dismissed. Subsequently, defendant was civilly committed.

As a result of these two dismissals, the State brought a special action to this court and we vacated both dismissals on the ground that the Superior Court lacked jurisdiction to decide defendant's motion while he was still incompetent. *State ex rel. Ber-*

*ger v. Superior Court,* 111 Ariz. 212, 526 P.2d 1234 (1974).

On 18 November 1974, Judge Rose appointed five doctors to examine the defendant as to his competency to stand trial and on 19 February 1975 he was found competent. Trial began on 14 April 1975 and the jury returned a verdict of guilty on all seven counts. Defendant was sentenced to seven consecutive life terms and appeals.

## DUE PROCESS

Defendant contends that his commitment to the Arizona State Hospital constituted a violation of his constitutional right to due process. His argument is based upon the United States Supreme Court's decision in *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). In that case, the defendant was a deaf mute with the mental acuity of a preschool child. He was charged with two separate robberies each involving five dollars or less. At a hearing to determine his competency to stand trial, it was established that he was unable to understand the charges against him or to participate in his defense. In addition, both doctors who had examined him expressed serious doubts as to whether petitioner would ever be able to develop the ability to communicate to any great degree. Based on this evidence, the trial court ordered Jackson committed to the Indiana Department of Mental Health until such time as he could be certified "sane." Defendant's attorney then sought a new trial on the basis that there was no evidence that Jackson was "insane" or that he would ever, in fact, become "sane," in the sense of competency to stand trial. He argued that Jackson's commitment constituted a "life sentence" and violated his Fourteenth Amendment rights to due process and equal protection. The trial court denied the motion for a new trial and the Supreme Court of Indiana affirmed. On certiorari, the United States Supreme Court reversed and remanded stating:

> "We hold, consequently, that a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant. Furthermore, even if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal." (Footnote omitted) *Jackson v. Indiana,* supra, 406 U.S. at 738, 92 S.Ct. at 1858, 32 L.Ed.2d at 451.

The Supreme Court's opinion in *Jackson,* supra, was not handed down until five months after the defendant in the instant case had been committed. The opinion was not made retroactive. Nonetheless, defendant contends that he was entitled to a hearing immediately following that opinion. He submits that the State's failure to hold such a hearing constitutes a flagrant violation of due process. We do not agree.

At the time of his commitment, the statutory procedure prescribed by A.R.S. § 13-1621 was properly complied with. Following *Jackson,* supra, Rule 11.5, Arizona Rules of Criminal Procedure (1973), was promulgated by this court. That rule provides in part as follows:

"Rule 11.5 *Hearing and orders*

"a. *Hearing.* When the examinations have been completed, the court shall hold a hearing to determine the defendant's competency. The parties may introduce other evidence regarding the defendant's mental condition, or by written stipulation, submit the matter on the experts' reports.

"b. *Orders.* After the hearing:

(1) If the court finds that the defendant is competent, proceedings shall continue without delay.

(2) If the court determines that the defendant is incompetent and that there is no substantial probability that he will

38

become competent within a reasonable period of time, it shall

(i) Order him civilly committed if it finds that his condition warrants such commitment according to the standards provided by law; or

(ii) Release him forthwith.

(3) If the court determines that the defendant is incompetent, but that there is a substantial probability that he will be restored to competency within a reasonable period of time, it shall order him committed to the supervision of an institution authorized to receive him for an indefinite period not to exceed six months or his earlier attainment of competency."

The Comment to Rule 11.5(b) indicates that it was drafted to comply explicitly with the United States Supreme Court's decision in *Jackson,* supra. It further provides that:

"If the court finds the condition of the defendant to be permanent, it can either commit the defendant civilly if it finds him committable under the civil standard of Ariz.Rev.Stat.Ann. § 36–514(c) (Supp. 1972) (dangerous to himself or others), or release him outright.

"The trial court may consider evidence concerning the pending criminal charges in determining the defendant's dangerousness; however, it cannot base a finding of dangerousness on the filing of the criminal charges alone. See *Jackson,* supra, 406 U.S. at 729–30, 92 S.Ct. 1845. See also *Baxstrom v. Herold,* 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966). "If the court finds the defendant to be incompetent, but not permanently so, it has a wide range of options. It can commit the defendant to a mental institution, if it finds either that he would be dangerous to himself or others if left at large, or that institutional treatment would be the most appropriate form of therapy. Either finding appears to be a sufficient basis for commitment under *Jackson.* If neither condition applies, the court must release the defendant upon appropriate conditions, one of which should be participation in a suitable therapeutic program. No order made under this section is to be

effective for longer than six months, thereby insuring a frequent review of each incompetent's status and progress."

On 1 November 1973, in *State v. Clemons,* 110 Ariz. 79, 515 P.2d 324 (1973), we held A.R.S. § 13–1621, the statute under which Freeman had been committed, unconstitutional. Having done so, we noted that there was no rule applicable to those cases commenced prior to 1 September 1973, the effective date of the Rules of Criminal Procedure. To remedy this problem, we further held both Rule 11 and Rule 25 of the Rules of Criminal Procedure (1973), be applied "to all criminal matters pending after the issuance of the mandate in this case even though commenced prior to 1 September 1973." Thus, Rule 11 was specifically made applicable to Freeman for the first time.

Less than four months after this court's decision in *State v. Clemons,* supra, the Arizona State Hospital advised the Superior Court that it believed defendant was competent to stand trial and a hearing date was set pursuant to the requirements of Rule 11. Under the facts in the instant case, it appears that defendant was not competent to stand trial until the state hospital determined this to be the case. He was returned to the court for hearing as soon as it was felt he was competent. We find no violation of due process.

## SPEEDY TRIAL

Defendant also contends that his commitment constituted a violation of his constitutional right to a speedy trial and that as a result we must dismiss.

■ There can be no doubt, following the United States Supreme Court's decisions in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) and *Strunk v. United States,* 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973), that if it is determined that there has been a constitutional denial of speedy trial, dismissal must remain "the only possible remedy." *Barker v. Wingo,* supra, 407 U.S. at 522, 92 S.Ct. at 2188, 33 L.Ed.2d at 112.

Defendant again relies heavily on *Jackson v. Indiana,* supra. While that case discussed certain factors which might be significant in determining whether or not a given delay for the purpose of determining competency was justified, it primarily addressed the due process and equal protection rights of a criminal defendant who has been committed on the basis that he is presently incompetent to stand trial. The court specifically declined to resolve the speedy trial issue on the basis that that issue had not been presented to the Indiana state courts.

In *State ex rel. Haskins v. County Court of Dodge County,* 62 Wis.2d 250, 214 N.W.2d 575 (1974), the Supreme Court of Wisconsin rejected a similar claim made on behalf of a number of criminal defendants previously committed on the basis that they were incompetent to stand trial. Periods of confinement ranged from fifteen months to eleven years. In reaching its decision, the court acknowledged:

> "If, in fact, the constitutional standards which require speedy trial have been subverted by the period of confinement resulting from the inability to stand trial, a judge can, and should, in the exercise of his constitutional obligations, dismiss on the merits." 62 Wis.2d at 269, 214 N.W.2d at 585.

However, it rejected the claim asserted by defendant in the instant case:

> "We conclude, however, that the mere fact of confinement beyond the time when it appears likely that a defendant will recover his competency, whether under the original commitment by the criminal process or by a subsequent civil commitment, does not *ipso facto* mandate a dismissal on grounds of denial of a speedy trial." 62 Wis.2d at 270, 214 N.W.2d at 585.

In *Brown v. Jaquith,* 318 So.2d 856 (Miss. 1975), the Mississippi Supreme Court held, based on *Jackson,* supra, that the defendant who had been confined for nine years on account of his incapacity to stand trial for murder must either be civilly committed or released. In doing so, it specifically stated that civil commitment would not result in dismissal of the criminal charges against him, indicating inferentially that his long pretrial commitment did not necessarily require a dismissal on speedy trial grounds. See also *Kesselbrenner v. Anonymous,* 75 Misc.2d 289, 347 N.Y.S.2d 369 (1973); *People ex rel. Anonymous v. Waugh,* 76 Misc.2d 879, 351 N.Y.S.2d 594 (1974); and *In re Horvath,* 42 Ohio St.2d 60, 325 N.E.2d 895 (1975).

In *United States ex rel. Little v. Twomey,* 477 F.2d 767 (7th Cir. 1973), the court stated that in determining what would be construed as a reasonable period of time during which a defendant may be held in order to ascertain whether or not there is a substantial probability that he will regain competency in the near future, the nature of the offense should be considered. We too believe that the gravity of the offense involved bears some relation to what will be construed as "a reasonable period of time." Here the defendant had been charged with seven counts of murder. Similarly, in *Twomey,* supra, the defendant was also charged with murder. By contrast, however, the defendant in *Jackson,* supra, was charged with two separate robberies involving property and money of a total value of less than ten dollars.

*Barker v. Wingo,* supra, discussed at length the parameters of the constitutional right of speedy trial. The court stated that "any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case; * *." 407 U.S. at 522, 92 S.Ct. at 2188, 33 L.Ed.2d at 112. In adopting a "balancing test" under which the conduct of the prosecution and the defendant are to be weighed, the court identified four factors which should be considered: (1) length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant. 407 U.S. 530–32, 92 S.Ct. at 2192, 33 L.Ed.2d at 117–118.

■ Applying those factors here, the defendant had been committed for approximately twenty-five months when the State Hospital reported that he was competent to

stand trial and a hearing was scheduled. The first five months of that period preceded *Jackson,* supra, and the delay which followed the hospital's report resulted from the defendant's own motion to dismiss.

The reason for the delay was, of course, defendant's incompetency to stand trial. In evaluating that reason, we believe that it is significant that the holding in *Jackson,* supra, focused upon indefinite commitment in the sense of a commitment not justified by progress toward regained capacity. In the instant case, Dr. Harrison Baker of the Arizona State Hospital filed an affidavit in which he stated "[t]hat Freeman did improve shortly after admittance and has steadily improved, to the point where he is now competent to stand trial." Thus, we believe reason for the delay was substantially justified.

■ The third factor identified in *Barker,* supra, was the defendant's assertion of his right. Here, neither the defendant nor his attorneys made any attempt to assert his right to a speedy trial until after the hospital had reported that he was competent. We do not consider that fact significant, however, in light of the defendant's incompetency.

Finally, we must consider any prejudice to the defendant which may have resulted from the delay. In his brief defendant asserts that the most significant prejudice he suffered was the fact of confinement itself. While the court in *Barker,* supra, did indicate that the speedy trial right was designed to prevent "oppressive pretrial incarceration" we do not believe defendant's commitment to the State Hospital was prejudicial. During his commitment defendant was evaluated at regular intervals and apparently received continuing medical treatment. In light of his steady improvement and subsequent recovery in the sense that he was found competent to stand trial, that treatment must have been of some value. While it may be that defendant did not want to go to trial at all, and to that extent he may not feel that his recovery was beneficial, this does not constitute legal prejudice. In his recovered state, he is better able to assist in his defense. Thus, we cannot conclude that defendant's confinement itself was prejudicial.

In *Barker,* supra, however, the court noted that the most serious type of prejudice occurs when the delay impairs the defendant's ability to present his defense. Here, defendant alleges that one of his key witnesses on the issue of insanity, a Dr. Breitner, died during the delay in question. He asserts that Dr. Breitner was of the opinion that defendant was insane when the crime took place, and that that opinion was based upon an examination which was conducted shortly after the event. He argues that he was prejudiced by the death of Dr. Breitner in that Dr. Hoogerbeets, who was appointed to replace Dr. Breitner, did not examine the defendant until more than three years after the fact and testified for the State that defendant was sane.

An examination of the record, however, does not support defendant's claim. First, defendant fails to provide any source, in the record or elsewhere, for his assertion that Dr. Breitner died during defendant's commitment. In fact, from the record before us, it is impossible to determine whether or not Dr. Breitner is, in fact, dead. All we do know is that on 27 November 1974, Dr. Hoogerbeets was appointed to replace Dr. Breitner.

Second, defendant also failed to indicate the source for his claim that Dr. Breitner would have testified that defendant was insane at the time of the murders. We have searched the record exhaustively for anything to support that claim and have found nothing. The only report by Dr. Breitner in the record before this court deals specifically with defendant's competency to waive his right to counsel and his competency to stand trial. It expresses no opinion whatsoever on the issue of defendant's sanity at the time of the incident in question.

Finally, at defendant's trial a total of four psychiatrists and one psychologist testified in his behalf on the issue of insanity. The State presented two psychiatrists. Of the five testifying for the defendant, four

testified that they had examined him in 1971, shortly after the crime. One of the four testified that he had seen the defendant both before and several times after the incident. Another testified that he had seen the defendant eight times between October and December 1971. A third testified that he had seen the defendant twice in 1971 and approximately every other month thereafter. All five testified that defendant was insane at the time in question. Considering this mass of evidence, even if the delay did prevent the defendant from presenting Dr. Breitner's testimony, and if, in fact, he would have testified that defendant was insane, that testimony would have been at best cumulative. We find no prejudice.

Based on the fact that the delay was justified by continuous progress toward regained capacity and the absence of any prejudice to the defendant, we are convinced that his confinement did not constitute a denial of his right to a speedy trial.

## DR. HOOGERBEETS' TESTIMONY CONCERNING DEFENDANT'S SANITY

On 20 May 1974, defendant's attorney filed a notice of defenses, listing as the second defense that defendant was insane at the time of the crimes alleged. In response, the State filed a motion to have defendant's mental condition examined, specifically requesting a determination as to defendant's competency to stand trial and his mental condition at the time of the offense. The defendant opposed any examination as to his sanity at the time of the offense until the competency question had been resolved.

On 25 November 1974, following a hearing as to whether the appointed psychiatrists should inquire into defendant's state of mind at the time of the alleged offense in addition to his competency to stand trial, the court entered the following order:

"ORDERED that psychiatric evaluation of defendant's state of mind at the time he is alleged to have committed the offense, which would be opinion by the appointed psychiatrists, as to Questions 6 and 7 on the Notice of Appointment form shall not be made by the appointed psychiatrists until after the determination has been made by this Court of whether the defendant is competent to stand trial and competent to assist in his own defense * * *."

At defendant's trial, Dr. Hoogerbeets testified for the State that he examined the defendant on 20 December 1974. In response to specific questions on direct about that examination, he stated:

"Q All right, Sir. Now, at the conclusion of your examination of the defendant, did you formulate certain opinions as to what you found?

"A Yes. I did.

"Q And what opinions did you come to, so far as your examination was concerned?

"A The first question asked by the Court, when I was appointed, was as to his competency to stand trial at the time of my examination, which I answered in the affirmative, in my opinion. In other words, he was competent to stand trial.

On a later date, additional questions were asked as to his probable mental condition at the time of the alleged offense."

The county attorney then posed a hypothetical question in response to which Dr. Hoogerbeets testified that defendant was sane at the time of the alleged offense.

■ On appeal, defendant argues that the examination by Dr. Hoogerbeets on 20 December 1974 violated his Fifth Amendment privilege against self-incrimination. His contention is that when the examination took place, the issue of his sanity at the time of the alleged offense was not properly before the court. Thus, he asserts the examination was improper. While he concedes that his attorney had raised the insanity defense he nonetheless asserts that only a defendant himself can raise the insanity defense because that defense necessarily constitutes a waiver of the Fifth Amendment privilege against self-incrimination.

Defendant cites the Ninth Circuit case of *United States v. Malcolm,* 475 F.2d 420 (9th Cir. 1973) for the proposition that the Fifth Amendment stands between a defendant and a compelled psychiatric examination before he raises the insanity defense. While *Malcolm,* supra, in dicta discusses the propriety of compelling a defendant to submit to such an examination, we do not believe it is applicable to the facts here.

A reading of the court's order set forth above indicates that the court did not compel the defendant to submit to an examination concerning his sanity at the time of the offense. Rather, the order contemplated that the psychiatrists would not evaluate defendant's state of mind at the time of the alleged crimes until after the court had determined defendant's competency to stand trial. What, in fact, happened, however, and what defendant apparently objects to is that Dr. Hoogerbeets was able to testify at trial on the question of defendant's sanity at the time of the offense based on his earlier examination for competency and without conducting a second examination.

We have held that a psychiatrist appointed to examine the defendant for the purpose of determining his competency to stand trial may give his opinion as to the defendant's sanity at the time of the offense. *State v. Magby,* 113 Ariz. 345, 554 P.2d 1272 (1976). Moreover, in *United States v. Mattson,* 469 F.2d 1234 (9th Cir. 1972), the Ninth Circuit also held that a psychiatrist who had conducted a competency examination could give his opinion as to the defendant's sanity. Although the court distinguished *United States v. Driscoll,* 399 F.2d 135 (2nd Cir. 1968) on its facts, it nonetheless quoted from the dissent in that case as follows:

"Judge Anderson, dissenting in Driscoll, pointed out that it is not necessarily unfair or damaging to a defendant for the government to call a psychiatrist who had previously examined him under [18 U.S.C. § 4244 which authorizes competency examinations] provided the expert 'can, be-

cause of the completeness of his original examination, qualify to give an opinion on the mental competency of the accused at the time the offense was committed. *Jones v. United States,* 109 U.S.App.D.C. 111, 284 F.2d 245, 249 (1960). Actually a thorough examination under § 4244 of one awaiting trial almost inevitably includes the disclosure of sufficient information and material out of his recent past to warrant the expert's conclusion as to the accused's sanity at the time the offense was committed.' 399 F.2d at 140." *Mattson,* supra, at 1236.

■ Dr. Hoogerbeets' testimony itself indicates that the first question he answered was whether defendant was competent and that only "on a later date" was he asked to give his opinion as to the defendant's state of mind at the time of the alleged offense. We believe that while a court may, in appointing a psychiatrist, restrict his examination to a determination of competency and instruct him not to reveal his conclusions as to the defendant's sanity at the time of the alleged offense, it cannot prevent him from forming an opinion on that issue. In a practical sense, it may very well be impossible for a psychiatrist to form an opinion as to the defendant's competency without also forming an opinion as to his sanity. Prohibiting him from revealing that opinion will fully protect the defendant, but forcing him to conduct a second examination when he has already formed an opinion as to defendant's sanity would serve no purpose. As stated by Justice Levin of the Supreme Court of Michigan, concurring in *People v. Garland,* 393 Mich. 215, 224 N.W.2d 45 (1974):

"There is no constitutional requirement that a psychiatrist, who has learned in the course of an examination to determine competency what he thinks necessary to enable him to testify on sanity, conduct yet another examination or that the State provide yet another doctor to examine the defendant on the sanity issue." (Footnote omitted) 393 Mich. at 230, 224 N.W.2d at 51.

## DR. HOOGERBEETS' TESTIMONY CONCERNING THE DEFENDANT'S STATEMENTS ABOUT THE CRIME

As we have previously indicated, Dr. Hoogerbeets testified as a rebuttal witness for the State on the issue of defendant's sanity. After he had testified that in his opinion defendant was sane at the time of the alleged offense, Dr. Hoogerbeets further testified that he believed defendant was aware he was killing the victims. At that point, the following exchange occurred between the county attorney and Dr. Hoogerbeets:

"Q For what reason was he killing these people?

"A In my opinion, it was an act of revenge.

"Q What things are you drawing on now as to the reason of revenge in killing these people?

"A My original opinion was based on my own evaluation of the defendant and again, it's substantiated by the account you just read me, which substantiates some of the statements he made and some of his actions which confirm this opinion that this was an act of revenge."

The "account" which Dr. Hoogerbeets referred to in his answer was a hypothetical question which the county attorney had previously put to him. It included all of the facts which the State had been able to put in evidence leading up to the night of the crime and surrounding the offense itself. Following Dr. Hoogerbeets' response, defendant's attorney asked to approach the bench, and out of the hearing of the jury moved for a mistrial. His motion was denied.

On appeal, defendant argues that this testimony violated A.R.S. § 13–1621(J) and Rule 11.7, Arizona Rules of Criminal Procedure (1973).

We note at the outset that while A.R.S. § 13–1621(J) does not differ radically from Rule 11.7, the latter is controlling. As we have already indicated, Rule 11 was made specifically applicable to this case by virtue of *State v. Clemons,* supra. In addition, the Comment to Rule 11 provides:

"*Scope of the Rule.* Rules 11 and 25 are intended to supplant and completely replace Ariz.Rev.Stat.Ann. §§ 13–1621 and 13–1621.01 (Supp.1972). The basic authority for this overruling can be found in Ariz.Const. art. 6, § 5(5), which grants the supreme court the power to enact 'rules relative to all procedural matters in any court.'"

Thus, the question we must resolve is whether the admission of Dr. Hoogerbeets' testimony violated Rule 11.7(b)(1) which provides as follows:

"b. *Privileged Statements of Defendant.*

"(1) No statement of the defendant obtained under these provisions, or evidence resulting therefrom, concerning the events which form the basis of the charges against him shall be admissible at the trial of guilt or innocence, or at any subsequent proceeding to determine guilt or innocence, without his consent."

In *State v. Evans,* 104 Ariz. 434, 454 P.2d 976 (1969), we said:

"* * * we do think that to permit even a psychiatrist acting for the court to transmit a defendant's incriminating statements to a jury is fundamentally unfair." 104 Ariz. at 436, 454 P.2d at 978.

In that case, the psychiatrist related to the jury the exact statements the defendant had made to him about the crime in question. We held that the admission of that testimony constituted reversible error.

In *State v. Magby,* supra, we held that testimony by a psychiatrist relating the defendant's statements to him concerning the crime itself violated Rule 11.7(b)(1) and was fundamental error. However, in light of the fact that two eyewitnesses testified to the facts surrounding the shooting, we found the error harmless.

In the instant case, the testimony of Dr. Hoogerbeets concerning defendant's admissions violated Rule 11.7(b)(1). While Dr. Hoogerbeets did not relate any incriminating statements made by the defendant as had the psychiatrists in Evans, supra, and

Magby, supra, he did testify that the hypothetical question which related the facts surrounding the crime "substantiated" some of the statements defendant made to him. The clear inference of that testimony is that the defendant had made a number of incriminating statements to Dr. Hoogerbeets. A less direct yet reasonable inference is that the defendant had confessed to Dr. Hoogerbeets and the hypothetical confirmed that confession. In any event, a juror listening to Dr. Hoogerbeets' testimony would be forced to conclude that the defendant had admitted committing the crime.

In *Ulin v. Riddel*, 111 Ariz. 435, 532 P.2d 155 (1975), we held that evidence obtained by an examining psychiatrist not only could not be used to affirmatively establish guilt, but further could not be used in any way against the defendant other than to establish sanity. The purpose of an examination pursuant to Rule 11 is to enable the psychiatrist to evaluate the defendant's mental condition. It is not to enable him to testify as to whether or not the defendant committed the crime in question. See Berry, Self-Incrimination and The Compulsory Mental Examination: A Proposal, 15 Ariz.L.Rev. 919 (1973). We believe, therefore, that a psychiatrist may not testify either directly, by repeating the defendant's incriminating statements, or indirectly, by stating or inferring that the defendant made incriminating statements to him. Since that was the effect of Dr. Hoogerbeets' testimony, its admission was error.

Having established that it was error, we are convinced that it was harmless error beyond a reasonable doubt. Although the defendant pled not guilty as well as not guilty by reason of insanity, the fact that he shot the victims was never in doubt. The only defense presented at trial was insanity. None of the defendant's witnesses addressed the facts surrounding the crime itself other than as to how those facts supported or failed to support their opinion as to defendant's sanity. No attempt was made to establish that the defendant did not fire the fatal shots. Moreover, the State's evidence which showed that the defendant purchased the guns in question, that he was seen leaving the Bentley residence after the first series of shots, walking out to a car and returning to the house just prior to the second series of shots, that he was seen by the police in the Bentley's backyard with the guns still in his possession and apprehended immediately thereafter, established beyond any question that the defendant shot the victims.

Defendant argues, however, that the implication to be derived from Dr. Hoogerbeets' testimony is not merely that the defendant incriminated himself, but that he admitted that his motive was revenge. He contends that revenge was an important part of the State's rebuttal case and a significant factor in the jury's decision that he was not insane. Thus, he submits that since the testimony in question pertained to the revenge issue a reversal is mandated. We do not agree.

The entire factual setting of the case compels the conclusion that the defendant was motivated by revenge. The State had shown by the testimony of numerous witnesses that the defendant was deeply distraught at his wife's disappearance and obsessed with the belief that she had run off with Mr. Bentley. In July the defendant himself said to Mrs. Bentley that he ought to kill the entire Bentley family "just for revenge." When he was arrested moments after the killings he told the police officers: "I guess that'll teach that son of a bitch, to run off with my wife and kids." Moreover, the defendant's own witnesses indicated that he was motivated by revenge. For example, Dr. Dean, testifying on the sanity issue on direct examination, said that the defendant "began to develop a delusional thinking pattern to explain why she [defendant's wife] had abandoned him and this delusional pattern incorporated his ex-employee Bentley and partly this was to, as it were, excuse her, that she was seduced away, not going so much on her own volition." Dr. Enos, another witness called by the defendant on the issue of insanity, admitted on cross-examination that he had

noted that the defendant had underlined certain passages in the Satanic Bible dealing with vengeance and revenge. He conceded in addition that the language not only sanctioned revenge, but required it. A third doctor called by the defendant, after explaining in his direct examination testimony that a person who is psychotic and insane could still be motivated by revenge, testified on cross-examination that part of the defendant's motive in this case was, in fact, revenge. Dr. Hoogerbeets' testimony was a negligible addition to the extensive evidence concerning revenge.

Consequently, we believe that the error in admitting Dr. Hoogerbeets' reference to the defendant's statements did not contribute to the verdict and was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

## CLOSING ARGUMENT

Defendant contends that the county attorney's remarks made during his closing argument to the jury together with an emotional reaction by a member of the Bentley family deprived him of a fair trial. The remarks to which he objects are as follows:

> "And Debra; he wants Debra to call him Uncle John. That's just great. Excellent. Uncle John, huh? Here's what old Uncle John did (displaying photograph) "You don't see much of this in T.V., do you?
> "Good old Uncle John.
> "Uncle John.
> "Uncle John.
> "Uncle John!
> "The reason why Novella wasn't talking to her neighbor, Mrs. Gossage (displaying photograph).
> "There is Pam (displaying photograph), Adam (displaying photograph), Charlotte (displaying photograph). Uncle John. This is Charlotte (displaying photograph)."

Defendant's counsel interrupted the county attorney at this point and out of the hearing of the jury moved for a mistrial on the basis of this argument to the jury and the fact that a member of the Bentley family apparently had left the courtroom crying. His motion was denied. However, the court ordered the spectators other than members of the press excluded pursuant to Rule 9.3(b) and (c), Rules of Criminal Procedure (1973).

■ Defendant, in arguing that this was highly prejudicial and improper, asserts that "the only defense, thus the only issue, [in this case] was insanity * * *." While he would agree from the evidence that insanity was, in fact, the only issue, nevertheless defendant did plead both "not guilty" and "not guilty by reason of insanity." Thus the State was required to prove not only that the defendant was sane at the time of the alleged offense, but that he, in fact, committed the crime in question with malice and premeditation.

■ Wide latitude is permitted in the presentation of closing arguments to the jury. *State v. Gonzales*, 105 Ariz. 434, 466 P.2d 388 (1970); *State v. Robinson*, 99 Ariz. 241, 408 P.2d 29 (1965). The reason for allowing such latitude is that closing arguments are not evidentiary in nature, thus counsel are allowed to comment on the evidence which has been introduced and to argue reasonable inferences therefrom. *State v. Propp*, 104 Ariz. 466, 455 P.2d 263 (1969). Because of this wide latitude, jurors are instructed as they were here that:

> "Arguments and comments of Counsel are not evidence. They are intended to help you understand the evidence and apply the law.
> "The attorneys may argue reasonable inferences from the evidence, but you are to disregard any comment which had no basis in the evidence.
> "It is your duty to determine the facts from the evidence produced by the testimony of the witnesses and by the exhibits received in evidence. You are permitted to draw from the facts which you find such inferences as seem reasonable and justified."

The general rule for determining whether an attorney's closing remarks were unduly prejudicial was set forth in *Sullivan v. State*, 47 Ariz. 224, 55 P.2d 312 (1936):

"The best rule for determining whether remarks made by counsel in criminal cases are so objectionable as to cause a reversal of the case is, Do the remarks call to the attention of the jurors matters which they would not be justified in considering in determining their verdict, and were they, under the circumstances of the particular case, probably influenced by these remarks." 47 Ariz. at 238, 55 P.2d at 317.

And:

"[W]hether or not improper argument in a criminal case has influenced the verdict must be left to the sound discretion of the trial court on motion for a new trial. (citations omitted) If there has been no abuse of that discretion and it appears that substantial justice has been done the court will not reverse the judgment. (citations omitted) Counsel should always confine their argument to the pertinent law and facts of the case." *State v. Merryman*, 79 Ariz. 73, 74–75, 283 P.2d 239, 241 (1955).

Defendant's argument relies on *United States v. Haynes*, 466 F.2d 1260 (5th Cir. 1972). However, that case can be easily distinguished as the alleged improper comments there were made while the prosecutor was questioning the defendant on the witness stand not during closing argument.

 The photographs used by the county attorney, as the defendant himself concedes, had been properly admitted into evidence. They were relevant to the State's case and properly subject to consideration by the jury. *State v. Zaerr*, 110 Ariz. 585, 521 P.2d 1131 (1974). As for the manner of their presentation, we have said:

"In the closing argument, excessive and emotional language is the bread and butter weapon of counsel's forensic arsenal, limited by the principle that attorneys are not permitted to introduce or comment upon evidence which has not previously been offered and placed before the jury." *State v. Gonzales*, supra, 105 Ariz. at 437, 466 P.2d at 391.

The county attorney neither introduced nor commented upon evidence which had not previously been offered and placed before the jury. The trial court ruled that the prosecutor's argument did not improperly influence the jury and we find no abuse of discretion.

Judgments and sentences affirmed.

STRUCKMEYER, V. C. J., and HAYS, HOLOHAN and GORDON, JJ., concur.