586 P.2d 1274

**The STATE of Arizona, Appellee,**

v.

**David Ralph STEELE, Appellant.**

No. 4141.

Supreme Court of Arizona,
In Banc.

Nov. 15, 1978.

Bruce E. Babbitt, Former Atty. Gen., John A. LaSota, Jr., Atty. Gen. by William J. Schafer III and Steven D. Sheldon, Asst. Attys. Gen., Phoenix, for appellee.

Frank S. Tilyou, Jr., Phoenix, for appellant.

CAMERON, Chief Justice.

Defendant David Ralph Steele was adjudged guilty of second degree murder (A.R.S. §§ 13–451, 452) following trial to a jury in the Superior Court of Maricopa County. He was sentenced to serve not less than ten nor more than ten and one-half years in the Arizona State Prison. He appeals from the jury verdict and judgment. This court has jurisdiction pursuant to Rule 47(e)(5), Rules of the Supreme Court, 17A A.R.S.

Defendant raises four issues on appeal. Since the matter will have to be reversed as to one of the issues and we do not find error in the other questions, we will consider only two of the issues raised:

1. Whether the display and admission of the decedent's bloody shirt was so prejudicial as to overcome its probative value.

2. Whether there was reversible error in the instruction given on self-defense.

The charges against defendant Steele arose out of a fatal shooting which took place on 26 May 1976 outside a bar, Kathy's Cocktails, owned by the defendant and his wife and located in north central Phoenix.

Although the testimony is conflicting, it appears that the decedent, Felix Eugene Helmick, Jr., had been a regular customer of the bar for two or three months and was on friendly terms with the defendant who frequently worked as bartender in the establishment. On 26 May 1976, Helmick first entered the bar in the early afternoon and had one drink, a tequila sunrise, departing from his usual beer. About half an hour later, after playing on a pinball machine and finishing his drink, he left.

Helmick returned to Kathy's Cocktails shortly after five p. m. that afternoon. This time Helmick was drinking gin and grapefruit juice. He alternated between standing at the bar and playing the pinball machine over the next hour while consuming three drinks. There was discussion with patrons of the bar about Helmick's new sunglasses which apparently had been expensive and which he claimed to have lost.

Helmick then demanded the sunglasses from the defendant. The defendant showed Helmick a pair of sunglasses which were lying on the counter but Helmick said they weren't his and renewed his demands. The defendant told Helmick that if he didn't calm down the police would have to be called. While in the process of dialing the number of the police, Helmick became quiet and the defendant hung up the phone without completing the call. After a brief interval, Helmick resumed his demands. This time he also pounded on the counter. Defendant Steele again said he would call the police and Helmick told him to go ahead. Helmick also threatened to "tear the place apart" if his sunglasses were not returned to him. As Steele was dialing the phone, Helmick threw a glass and an ash-tray behind the counter, breaking some glasses and at least one bottle of liquor. When Steele reached the police department, he asked to have someone come out to the bar because there was a drunk there who was "tearing the place up."

Helmick started out the door about the time Steele finished the call to the police. Steele went into the back room and got a gun. He came back into the bar and followed Helmick out the door with the gun in his right hand. Defendant was heard to say "Hold it right there" as he went out the door.

Steele testified that he had several concerns when he followed Helmick out the door: to obtain payment for drinks and damage to the bar, to keep Helmick there until the police arrived, and to alleviate his concern that Helmick might return with a gun that Steele testified he believed Helmick carried in his car. Finally, Steele testified that he was concerned about letting Helmick drive a car in his obviously intoxicated condition. Steele also testified that he did not take the gun with the intention of shooting Helmick and that at no time did he bear any hostility or ill will toward Helmick.

Steele testified that when he got outside, he noticed Helmick getting into Helmick's car. Steele walked up to the driver's side and rapped on the window to get Helmick's attention. Helmick, who was hunched over with his hands at his feet, ignored Steele so Steele rapped on the window with the butt of his gun. Helmick sat up and Steele told him that he couldn't leave without paying. Helmick responded by opening the door and getting out of the car. Steele testified that his action knocked him to the ground and that an enraged Helmick came after him in a threatening manner. Steele began backing up and told Helmick to stop or he would shoot. When Helmick failed to stop, Steele fired a warning shot at his feet. Helmick continued to come after him, now hunched over. Steele tripped over the carpeting on the sidewalk in front of the bar, fell, caught himself with his left hand and instinctively pointed the gun at Helmick and fired. Steele testified that at the time he fired he feared for his life.

Defendant's testimony was not supported by two others who witnessed part of the scene outside. Joan Gehon, a waitress at El Mirasol, heard yelling outside and went to the window of the restaurant to see what was happening. She testified that both men were standing still and that Steele was doing all of the talking. At one point, Helmick saw her and made a motion with his hand indicating that Steele had a gun. Called away by her customers she had turned from the window and was walking toward them when she heard the first shot which was followed by another two or three seconds later.

The second witness, Janell Lester, was driving by the bar westbound on Camelback

Road when her attention was caught by the sound of a gunshot. When she first looked, she was slightly to the east of the two men. She said that the two men she saw were facing each other. Both men were standing when she first looked but the one she identified as the defendant fell after the second shot was fired. Since she could not see the other man at this point, she at first assumed that the defendant was the one who was injured.

After the shooting, defendant Steele walked back into the bar and called the police again. As he walked toward the phone, someone asked if he had shot Helmick and he replied, "Damn right I did." He told the police that he had shot the man that he had called about earlier. Defendant cooperated with the police investigation of the shooting.

Trial before a jury commenced on 24 November 1976 and a verdict of guilty was returned on 7 December 1976. A judgment of guilty to second degree murder and a sentence of not less than ten nor more than ten and one-half years in the Arizona State Prison were pronounced on 7 January 1977. Defendant appeals.

## WHETHER DECEDENT'S BLOODY SHIRT SHOULD HAVE BEEN ADMITTED

Over defendant's objection, the State offered into evidence the bloodstained shirt worn by the decedent at the time of the shooting. Defendant argues that this was an abuse of discretion and reversible error because the prejudice created by the display of the shirt to the jury overcomes its probative value. We agree.

■ The admission of gruesome objects such as photographs, clothing, and weapons, when introduced for no other purpose than to inflame and arouse the passions of the jury, can lead to a conviction resulting from the jury's revulsion and not from the State's proving the elements of the crime. See *Janovich v. State,* 32 Ariz. 175, 180, 256 P. 359, 360 (1927). Cf. *State v. Zaerr,* 110 Ariz. 585, 521 P.2d 1131 (1974). There are,

admittedly, situations where the evidence, even though gruesome, is material to some aspect of the case. In those instances, admissibility of such evidence will depend on whether its probative value is outweighed by its potential to prejudice the jury. *State v. Thomas,* 110 Ariz. 120, 515 P.2d 865 (1973).

Where, however, it is apparent that the sole purpose for the introduction is to prejudice the jury, we will not hesitate to reverse on appeal:

"Defendant argues in this court that the admission of certain gruesome photographs of Makal's wife and children taken by the police after the homicides was highly prejudicial. We agree. Photographs may be material to establish the cause or manner of death or may have other probative value and may be admitted or excluded within the trial court's sound discretion. (citations omitted) Where as here there was substantially no controversy concerning the commission of the offenses, there was no significant reason for their admission into evidence. The photographs were highly inflammatory, without any particular saving purpose, and could only have tended to prejudice the defendant in the minds of the jurors. * * *" *State v. Makal,* 104 Ariz. 476, 478, 455 P.2d 450, 452 (1969).

■ If the display of the bloody shirt was in itself prejudicial, the sequence of events leading up to the shirt's display to the jury makes it more so. The defense was self-defense. The entrance and exit wounds were, of course, material as to whether the parties were standing, or, as the defendant contends, the victim was standing over the defendant at the time of the shooting. Prior to the introduction of the bloody shirt, the State had introduced pictures of the body of the victim showing the entrance and exit wounds. They were admitted without objection and clearly showed the path of the bullet. The State then called the wife of the deceased to identify, through the same pictures, the victim as her deceased husband. The following transpired:

"MR. TILYOU: Your Honor, at this time I believe that Mr. Lincoln is calling Mrs. Helmick merely for the purposes of identifying the decedent, and we would stipulate to that identification. I don't think it is necessary to put her through this.

"MR. LINCOLN: We decline the stipulation, Your Honor. I think the State is entitled to put on its case the way it believes that—

"THE COURT: You may proceed.

"MR. LINCOLN: Thank you.

MELANIE HELMICK,

called as a witness on behalf of the State, is duly sworn and testified as follows:

DIRECT EXAMINATION

"BY MR. LINCOLN:

"Q State your name, please?

"A Mrs. Melanie Helmick.

"Q Mrs. Helmick, was Felix Eugene Helmick a relative of yours?

"A Yes. He was my husband.

"Q I show you now what has been marked as Exhibit No. 8, and I ask you if you can identify the person depicted in that photograph?

"A Yes, I can.

"Q Who is it, please?

"A That is Felix Eugene Helmick, my husband.

"MR. LINCOLN: That is all I have of the witness, Your Honor.

"MR. TILYOU: I have no questions, Your Honor.

"THE COURT: You may step down. (Whereupon the witness is excused.)"

By this testimony, unnecessary in view of defendant's willingness to stipulate, the jury knew the identity of the victim's wife. Up to that time, Mrs. Helmick had been sitting in the audience of the courtroom despite the fact that Rule 9.3(a), Rules of Criminal Procedure, excluding witnesses from the courtroom had been invoked by the defendant. At the request of the State, the widow of the decedent had been allowed to remain in the audience even though the State indicated it would call her as a witness.

After the shirt was shown to the jury over defendant's objection and after the jury had been excused for the weekend, the following transpired:

"MR. TILYOU: I would just like the record to show that prior to the testimony of Officer Onusko in regards to the shirt of the decedent, Gene Helmick, I attempted to make a motion out of the presence of the jury in regards to identification or attempted introduction of said decedent's shirt, which the Court denied.

\*      \*      \*      \*      \*      \*

I would move at this time for exclusion of the shirt, itself. It is a gruesome and inflammatory object, not necessary to be introduced by the State, and that the shirt need not be introduced to establish any material or disputed facts, since the location of the wounds has been established by the testimony of Doctor Jarvis, of the County Medical Examiner's office. Both the entrance wound and exit wound.

I think that in fact the State, by having placed the shirt in front of the jury, by having Officer Onusko hold it out to identify it in full view of the jury and also in full view of the widow of the decedent, I feel that the State is in effect, 'waving the bloody shirt,' for no purpose except to inflame and prejudice the jury against the defendant, David Ralph Steele.

Further, I move at this time for a mistrial based on the conduct, unhappily, but the distressing conduct exhibited by Mrs. Helmick at the time she saw the shirt and fled from the courtroom when she started to break down. She was, as far as I could tell, fully observed by the jury. We would contend on behalf of the defense at this time that the conduct by Mrs. Helmick in conjunction with the bloody garment is sufficient to inflame and prejudice the jury. I think that the horror so to speak, of the death involved in this case

coupled with the appearance of the young widow in a high state of emotional distress rushing from the courtroom is sufficient to deny my client a fair trial, and I therefore move for a mistrial at this time.

"THE COURT: Mr. Lincoln?

"MR. LINCOLN: Your Honor, the shirt is relevant. Merely because we have some evidence of something doesn't mean we can't have more evidence, and the shirt contains the bullet holes, both the entry and exit bullet holes, and would be corroborative of that, corroborative of the fact of death, corroborative of the entire situation.

As far as the jury seeing the shirt, they don't know anything now that they did not before. They knew there was a lot of blood in the victim. And the shirt is obviously no surprise. I think it was very obvious why I had the officer take the shirt out of the bag. It is because he said he couldn't identify it in the bag unless he took it out and looked at it. He took it out and looked at it and was able to identify it.

Mrs. Helmick was instructed to, if she felt there was going to be any problem with her emotions, to leave the courtroom. I didn't look around to see what happened, but if that was her leaving the courtroom at the time the officer was identifying this shirt, then she was doing what she was properly instructed to do. And I can't see anything improper with that."

The court then noted regarding Mrs. Helmick's conduct:

"THE COURT: I did observe the conduct of Mrs. Helmick. I did note that she, as you put it, fled from the courtroom. She certainly did stand up with a companion. I don't know who the other person is. She did stand up and leave the courtroom. I thought very quietly. I could see it, but I did not hear the emotional outburst or any particularly audible sound from her. I frequently have seen other people leave the courtroom quite rapidly, whether they are a widow or otherwise just spectators. I watched it very carefully. I did not think that her conduct was as you seem to have believed that it was. Your view and my view are apparently a little different. But I was watching for that, Mr. Tilyou. I was watching for anything untoward which might occur there. I do not think that her conduct was such that the jury paid any attention. I watched her. I watched her companion. I watched the jury. I watched you and I watched the defendant and I watched Mr. Lincoln. I was watching all of you, and I just don't think that her conduct should be classified the way you viewed it."

We have examined the bloody shirt. It is apparent that it adds little, if anything, to the State's case. The pictures of the body show the entrance and exit wounds and more accurately than the shirt could. Although we have stated that cumulative evidence is permissible, *State v. Brierly,* 109 Ariz. 310, 509 P.2d 203 (1973), when, as here, the result of the pictures adds nothing to the evidence to be considered by the jury but tended, and we believe from the record was intended, only to arouse and inflame the emotions of the jury, it is reversible error.[1]

## WHETHER THERE WAS REVERSIBLE ERROR IN THE INSTRUCTION GIVEN ON SELF–DEFENSE

At the trial, defendant admitted shooting Helmick and relied heavily on a defense of self-defense for an acquittal. The trial

1. There is some question whether the shirt was ever admitted in evidence. The clerk's stamp on the shirt, Exhibit No. 7, shows that it was admitted on 26 November 1976. The reporter's transcript of 26 November 1976 indicates that defendant's objection to its admission was denied. Yet later, when discussing the motion for mistrial, the court stated:

"I take it that since there is no offer of the shirt that there can't very well be an objection to it at this point. You will be free to make the objection if Mr. Lincoln offers it. "I have given you my view of your observations so that you can anticipate a ruling if he makes the offer."
In any event, the shirt was shown to the jury.

court gave defendant's requested instruction on self-defense. On appeal, defendant contends that an instruction on retreat should also have been given. Defendant did not request this instruction. Since the matter will have to be retried, he can make a timely request for this and other instructions at that time.

Reversed and remanded for new trial.

STRUCKMEYER, V. C. J., and HAYS, HOLOHAN and GORDON, JJ., concur.